DIEDRICH vs. THE NORTHWESTERN UNION RAILWAY COMPANY.

*(1) The rule, stare decisis, applied.   (2) Parol construction of plat inadmissible.   (3) " Navigable waters " defined.   (4–10) RIGHTS OF RIPARIAN OWNERS.   (9) Burden of proof.   (11) Time for moving rehearing, how enlarged.*

1. The decision in *Emmons v. Milwaukee,* 32 Wis., 434, that the recorded plat of the city of Milwaukee made by Martin and Juneau in 1837, does not show any dedication to the public use of the strip of land adjacent to the lake shore not therein platted into lots and blocks (with a certain exception there named), adhered to, as a rule of property deliberately adopted after full argument on both sides.

2. While land reserved to the proprietors by their plat may be dedicated to the public by a subsequent and independent act *in pais,* the operation of the plat itself cannot be enlarged by the parol construction thereof by such proprietors or by the public.

3. Navigable waters, in this state, are such as are navigable in fact, though not affected by the ebb and flow of the tide.

4. Although, by the settled doctrine of this court, a riparian owner upon a river or stream, navigable or unnavigable, takes, in the absence of express limitation in his title, *usque ad medium filum aquæ (Olson v. Merrill, ante,* p. 203), such owner upon a natural lake or pond takes only to the natural shore thereof.   *Delaplaine v. Railway Co., ante,* p. 214, and *Boorman v. Sunnuchs, ante,* p. 233.

5. Riparian rights proper rest upon title to the *bank* of the water, and are the same whether the riparian owner own the soil under the water or not.

Diedrich vs. The N. W. U. R'y Co.

And, distinguished from the right arising in case of gradual and insen-sible accretion or reliction, the general right of appropriating and occu-pying the soil under the water, when such right exists, is not properly a riparian rights resting not upon title to the bank only, but more directly upon title to the soil under the water.

6. Distinguished from appropriation and occupation of the soil under the water, a riparian owner upon navigable water, whether or not he own the soil to the thread of the stream, has a right (unless prohibited by local law) to construct, in shoal water in front of his land, proper wharves or piers, in aid of navigation, and at his peril of obstructing navigation, through the water for enough to reach actually navigable water.

7. As a right of necessity, when water, navigable or not navigable, is by natural causes wearing away and intruding upon its banks, the riparian owner, whether or not he own the soil to the thread of the stream, may, as against the public, at his peril of obstructing the public use when the water is navigable, and at his peril of the necessity, intrude into the water for the construction of works necessary to the protection of his land against the action of the water.

8. In the case of navigable waters, any extension of possession, or intrusion, into the water, beyond the natural shore, other than those mentioned in the foregoing propositions, whether by the riparian owner or a stranger, without express and competent grant from the public, is a pourpresture, vesting no title in the person who makes it.

9. In a proceeding to obtain compensation for land condemned by a railroad company, on appeal to the circuit court from the appraisal of commis-sioners, plaintiff can recover only upon proof of title in himself to the land taken.

10. A riparian proprietor who has lawfully intruded into the water for the construction of a breakwater, cannot thereby acquire title in fee to land occupied by such breakwater beyond his original boundary; nor can he, in a proceeding for compensation for the alleged taking of such land, re-cover for any injury done to the breakwater.

11. Time under Rule XX of this court (relating to motions for a rehearing), can be enlarged by order of the court only, and not by mere stipulation.

APPEAL from the Circuit Court for *Milwaukee* County. Juneau and Martin's plat of Milwaukee, recorded in 1837, is thus described in *Emmons v. Milwaukee*, 32 Wis., p. 436: "Such plat is bounded on the west by the Milwaukee river; on the east by Lake Michigan; and is thirteen blocks in length from north to south, extending from Division street to Me-nomonee street. Along the whole east side of the plat there

is a vacant strip of land adjacent to the lake, and varying greatly in width. On the west side of this strip, and extending into it a trifle, a square of fifty feet is designated, in the east end of Wisconsin street; and, commencing near the same, there is written in the vacant strip the words, 'Reserved for Light House.' Further than this there is nothing in the plat, or in the notes or certificates accompanying it, to show for what purposes such strip was intended by the proprietors, or to show any intention or attempt to include it within the plat. It appears by other maps and plats in the case, that portions of this vacant strip have since been platted into lots and blocks." It appears from the evidence in the present case, that when such plat was made, the strip of land between block 100 and the lake was about seventy or eighty feet in width, and about sixty or seventy feet above the level of the lake, and descended precipitously to the lake beach.

In 1846, one McClure became the owner in fee of block 100, and of all the rights of the original proprietors in the land bounded by the eastern line of said block, the low-water line of Lake Michigan, and the northern and southern lines of the same block prolonged to such low-water line. Plaintiff afterwards acquired McClure's title to the whole of said property; and in 1859, he had a series of cribs, filled with stones, sunk in the lake about eighty-five feet from the shore opposite block 100, and filled the intervening space with earth, terracing and grading the land to the cribs. At that time the water in which the cribs were sunk was about five feet deep; but from the evidence given at the trial of this action, it appeared that the lake adjoining the cribs had then so filled up that a person could walk between the cribs and the water when the lake was quiet.

In 1872, the railway company, having located its road across the eastern portion of the land made in the lake in front of block 100 as above described, instituted proceedings to condemn so much of said land as it required for its track. The

strip sought to be condemned is seventy feet in width, and its eastern boundary appears to be four to eight feet west of the eastern edge of the cribs. The commissioners of appraisal awarded $7,000 as compensation for the value of the land taken and damages to the remainder of the tract. Plaintiff appealed from this award to the circuit court.

At the trial in the circuit court, it appeared that the land included in said plat was entered in August, 1835, by Peter Juneau ; that the certificate of entry was afterwards assigned to Martin; that in November, 1835, Martin conveyed an undivided half of the property to Solomon Juneau; that the latter and Martin caused this tract to be surveyed and platted by one Edgerton in 1835-6, and commenced selling lots according to that plat; that Juneau and Martin sold lot 3 in block 100 by a deed recorded October 1st, 1836, and Martin sold to Juneau lots 1 and 2 in the same block by deed recorded on the 4th of the same month, and these deeds constitute a part of plaintiff's chain of title; that said plat of 1835-6 was never recorded; that the recorded plat above described was made for Juneau and Martin from the earlier plats, by one Wells, in August, 1837; and that, so far as they affected the questions here in dispute, these plats were alike.

The testimony of Edgerton and Wells, as witnesses for the defendant, tended to show that while they were constructing said plats respectively, they had conversations, severally, the former with Mr. Juneau and the latter with Mr. Martin, in which those gentlemen spoke of the vacant strip along the eastern lines of blocks 98, 100, 101, etc., as a street, or as designed to be left open for a public ground. Mr. Edgerton further testified that on the plat made by him, said strip was left without a name because they "could not agree on a name." Questions put to this witness as to what he understood that strip to represent, and what Juneau and Martin intended it to represent, when witness made the survey and plat, were ruled out. Defendant also introduced testimony tending to

show that for a considerable number of years after 1836, the land between Lake Michigan and the east line of block 100, being covered by a grove of trees, was open and unoccupied, and "used as a sauntering place for the public;" that "it was generally claimed and understood that the public had a right there as public property;" that "citizens claimed it," and "the city officials, at that time, for years, supposed it to belong to the city;" and that "the city directed the city marshal to remove squatters off the bluff," and they were removed, though the witness did not know whether any of these squatters were located upon that part of said bluff which was in front of block 100.

The court, in its instructions to the jury, after stating that there was no doubt that the land which the railroad had taken was, in 1858 or 1859, a portion of Lake Michigan, added: "For the purposes of this suit I shall hold that the owner of the adjacent land had the right to fill in the lake to such an extent as he might deem proper, without interfering with navigation .... So far, therefore, as that question is concerned, you may regard as settled that the plaintiff is the owner of the property in question." As to the strip of land between the east line of block 100 and Lake Michigan, the court instructed the jury that if Martin and Juneau had by parol declared that said strip was to be left for a public highway, and if the public had subsequently taken and made use of the same as a highway with the acquiescence of the original owners, that would have been a dedication by parol; but that, under the evidence in this case, the public never having appropriated the land, and the owners, subsequent to the alleged parol dedication, having conveyed it by deed, the mere statement by them that they intended it as a highway did not amount to a dedication; that there was no evidence in the case to prove the dedication by acts *in pais;* and that in the judgment of the court the said strip was not a public highway.

The jury found specially that plaintiff was the owner of the

land condemned by the defendant company, and assessed his damages at $13,002; a motion for a new trial was denied, and defendant appealed from a judgment rendered in accordance with the verdict.

For the appellant, a brief was filed by *Mariner, Smith & Ordway,* and the cause was argued orally by *E. P. Smith* and *L. S. Dixon.* They contended, among other things, 1. That, independent of the express limitation by the description in his deeds, plaintiff's title to land adjacent to the lake could not extend beyond low-water mark. (1) The common-law doctrine limiting navigable waters to those subject to the ebb and flow of the tide, is not applicable here, but rivers navigable in fact are navigable in law. *Cooper v. Smith,* 9 Serg. & R., 26–32; *Schrunk v. Schuylkill Nav. Co.,* 14 id., 74; *Carson v. Blazer,* 2 Bin., 475; *Flanagan v. Philadelphia,* 42 Pa. St., 219; *Bullock v. Wilson,* 2 Port. (Ala.), 436; *McManus v. Carmichael,* 3 Iowa, 1; *People v. The Appraisers,* 33 N. Y., 461; *Browne v. Scofield,* 8 Barb., 243; *Stuart v. Clark,* 2 Swan, 9; *Wilson v. Forbes,* 2 Dev., 30; *Ingram v. Threadgill,* 3 id., 59; *Bainbridge v. Sherlock,* 29 Ind., 364; *Bowman's Devisees v. Wathen,* 2 McLean, 376; *Lowber v. Wells,* 13 How. Pr., 456; *Propeller Genesee Chief v. Fitzhugh,* 12 How. (U. S.), 454; *Railroad Co. v. Schurmeir,* 7 Wall., 272; *The Daniel Ball,* 10 id., 563; *The Montello,* 20 id., 441; *Whisler v. Wilkinson,* 22 Wis., 572; *Wis. Riv. Imp. Co. v. Lyons,* 30 id., 61; *Arimond v. G. B. & Miss. Canal Co.,* 31 id., 316–339; *Wright v. Day,* 33 id., 260–263; *Attorney Gen. v. Eau Claire,* 37 id., 446; Angell on W. C., §§ 536 et seq. (2) Whatever may be said of the ownership of the soil beneath the waters of our navigable rivers, it is settled that as to our fresh-water ponds and lakes, the title to the soil beneath their waters is in the public. 2 Washb. R. P., *364, *634, and notes; 3 Kent (9th ed.), 547, note; Angell on W. C., §§ 41, 42; *C. & St. L. R. R. Co. v. Valentine,* 19 Barb., 484; *Wheeler v. Spinola,* 54 N. Y., 377; *State v.*

*Gilmanton,* 9 N. H., 461; *Hathorn v. Stinson,* 10 Me., 238; *Bradley v. Rice,* 13 id., 198; *Waterman v. Johnson,* 13 Pick., 261. To the point that plaintiff had no title below low-water mark, counsel further cited Hall on Sea Shore, *passim; Attorney Gen. v. Rees,* 4 DeG. & J., 55; *Attorney Gen. v. Chamberlaine,* 4 K. & J., 292; *Patterson & N. R. R. Co. v. Stevens,* 34 N. J. Law (5 Vroom), 532. 2. That the shores of navigable waters and the soil under them belong to the state in which they are situate, as sovereign, and the ownership of the soil under the water of Lake Michigan west of the middle of that lake became vested in this state on its admission into the Union, subject only to the right of navigation. *Martin v. Waddell,* 16 Pet., 410; *Pollard's Lessee v. Hagan,* 3 How. (U. S.), 212–222; *Goodtitle v. Kibbe,* 9 id., 477; *Mumford v. Wardwell,* 6 Wall., 436; *Weber v. Comm'rs,* 18 id., 66; 3 Kent, 9th ed., 546; *Attorney Gen. v. Eau Claire,* 37 Wis., 446. 3. That the plaintiff's act in filling up the lake to a distance of eighty-five feet from the shore was an encroachment on the public domain, a pourpresture, and he did not thereby acquire any interest or title. In support of this view, counsel cited and commented upon *Dutton v. Strong,* 1 Black, 23; *Railroad Co. v. Schurmeir,* 7 Wall., 289; *Yates v. Milwaukee,* 10 id., 497–504; *Weber v. Harbor Commiss'rs,* 18 id., 57–65; *Atlee v. Packet Co.,* 21 id., 389; *Martin v. Waddell,* 16 Pet., 422; *People, etc., v. Mauran,* 5 Denio, 389; *Austin v. Railroad Co.,* 45 Vt., 215–242; *Walker v. Shepardson,* 4 Wis., 486; *Mariner v. Schulte,* 13 id., 692; *Arnold v. Elmore,* 16 id., 509; *Wisconsin Riv. Imp. Co. v. Lyons,* 30 id., 61; *Att'y Gen. v. Eau Claire,* 37 id., 447; Angell on Tide Waters, 198, 199, 203. In this connection counsel insisted that plaintiff would have no right to erect cribs even for the protection of his land against the action of the lake, causing a loss to him as a riparian owner, and a proportionate gain to the state (Angell on W. C., § 57; 2 Black, 262; *Mayor of New Orleans v. United States,* 10 Pet., 717);

but that the riparian owner, purchasing from the state, takes this hazard with the equal chance of gaining by accretion or reliction. *King v. Lord Yarborough,* 3 Barn. & Cress., 91; 6 Cow., 537, note; Hale's De Jure Maris, ch. 4. 4. That there was sufficient evidence of a dedication to the public of the land between the lake and blocks 98, 100, 101, etc. Such dedication may be proved by oral declarations, not only of the owners of the fee but of the surveyor employed to make the plat. *Barclay v. Howell's Lessee,* 6 Pet., 498; *Mayor of New Orleans v. United States, supra.* Platting lands into lots and blocks fronting on streets and alleys, and selling lots according to such plat, is an irrevocable dedication of such streets and alleys. Dillon's Mun. Corp. (1st ed.), § 503, note on p. 488, and cases cited; note to *Dovaston v. Payne,* 2 Smith's L. C. (4th Am. ed.), 181, and cases cited; *Chapman v. School Dist.,* Deady, 108; *U. S. v. Ill. Cent. R. R. Co.,* 2 Bissell, 182, note; *Wyman v. Mayor,* 11 Wend., 487; *Trustees v. Cowen,* 4 Paige, 510; *Godfrey v. City of Alton,* 12 Ill., 29; *Zearing v. Raber,* 8 Ch. Leg. News, 42; *Lownsdale v. Portland,* 1 Oregon, 397. It is not necessary that the places left for streets should be named, if it is apparent from the map in any way, or by the declaration of the vendor, that such places are intended as streets (*Waugh v. Leech,* 28 Ill., 488; *Abbott v. Mills,* 3 Vt., 526); nor as against the proprietor is any acceptance by the public necessary to complete dedication by such acts (Dillon's Mun. Corp., §§ 449, 505; *Cincinnati v. White's Lessee,* 6 Pet., 440; *Winona v. Huff,* 11 Minn., 135); but in this case there was sufficient evidence of an acceptance by the public. And if there was any dedication in this case, it extended to low-water mark. *Mariner v. Schulte,* 13 Wis., 692. On the subject of dedication, counsel further cited and commented upon *Rowan's Ex'rs v. Portland,* 8 B. Mon., 232; *Alves v. Henderson,* 16 id., 168; *Barclay v. Howell's Lessee,* 6 Pet., 498.

For the respondent, a brief was filed by *Cotzhausen, Syl-*

*vester & Scheiber*, and the cause was argued orally by *Mr. Cotzhausen.* They contended, among other things: 1. That the court did not err in instructing the jury that there was no evidence of a dedication to the public of the land between block 100 and the lake. (1) Where a dedication by acts *in pais* is claimed, the intention of the owner must be clearly and unequivocally established. *Gardiner v. Tisdale*, 2 Wis., 153; *Bushnell v. Scott*, 21 id., 451; *Buchanan v. Curtis*, 25 id., 99. (2) All declarations prior to the recording of the map became merged therein. The map must speak for itself. This question was presented by the record in *Emmons v. Milwaukee*, reported in 32 Wis., 434, was fully discussed by counsel, and was necessarily passed upon by the court in deciding that case. (3) There must be an acceptance by the public of such dedication, and an actual user of the property for the purposes for which it was dedicated; and such acceptance and user must be open and continuous. *Gardiner v. Tisdale, supra.* 2. That plaintiff had title to the land condemned by the defendant company. (1) The evidence seems to warrant the conclusion that plaintiff's cribs were not built below what might be called low-water mark at the time of the government survey, and that plaintiff, by what he did in 1858, merely sought to regain in part what he had previously lost by the washing of the lake. Where the land of a subject is overwhelmed by the sea, and again left dry, the right of the subject revives. Schultes on Aquatic Rights, 122; admission of the government in *King v. Lord Yarborough*, 3 Barn. & Cress., 98. (2) The right of the riparian proprietor to utilize the bank, shores and beds of navigable rivers and lakes for any reasonable purpose, so long as he does not interfere with the navigation, seems never in this country to have been questioned. His right to construct and maintain suitable harbors and wharves for the convenience of commerce and navigation, though extending far below low-water mark, no longer admits of discussion. *Dutton v. Strong*, 1 Black, 23; *Wis. Riv. Imp. Co. v. Lyons*, 30 Wis., 61; *Ari-*

*mond v. G. B. & M. C. Co.,* 31 id., 316. The right to protect
lands by the erection of suitable defenses, and to make use of
the shore and bed for that purpose, is recognized in England
as well as here. *Rex v. Comm'rs,* 8 Barn. & Cress., 360; *Gerrish v. Clough,* 48 N. H., 9; *Adams v. Frothingham,* 3 Mass.,
352; *Miller v. Milwaukee,* 14 Wis., 642; Laws of 1860, ch.
261. Keeping these principles in view, plaintiff's title to the
*locus in quo* may be upheld on several grounds: *First,* Because the land was *alluvion.* Land gained from the lake belongs to the riparian proprietor, whether formed by accretion
or reliction; and it makes no difference that the sinking of
cribs contributed to the accretion. *Attorney Gen. v. Chambers,* 4 De G. & J., 55; *King v. Lord Yarborough, supra;
County of St. Clair v. Lovingston,* 23 Wall., 46; *Mayor of
New Orleans v. United States,* 10 Pet., 717–18; *Adams v.
Frothingham, supra. Second,* On the ground of custom and
prescription. The title of the king or state to the bed is only
*prima facie;* the soil may be vested in a private individual,
and may form part of the adjoining manor or parish; title to
it may be acquired in the same manner that other rights in
real property are acquired; the presumption that the soil is
extra-parochial may be rebutted by evidence of ancient grant
from the crown, by common reputation, or otherwise; and where
the limits of the manor both on the land and sea side were
uncertain, common reputation, modern usage, and the exercise
by the lord of acts of dominion over the sea shore, were admitted in evidence to show the boundary on the sea side. 1
Addison on Torts, 135, 345, 347; Schultes, p. 30; Tyler on
Boundaries, 31, 36, 39. Even in case of an inquisition filed
by the government, title by custom to lands at one time *fundus maris* and formed *per alluvionem* has always been deemed
a good defense. *King v. Lord Yarborough, supra.* The existence and extent of the right are to be collected, as in other
instances of customary rights, from the manner in which the
particular portions of the sea shore throughout the kingdom

have from time immemorial been used. 1 Addison, 133. The acts which are relied upon as evidence of a lost grant of the shore, are commonly the constant and usual fetching therefrom of gravel, sea weed and sea sand; inclosing and embanking against the sea, and the enjoyment of what is so inclosed, etc. Tyler, 36. These general principles are elaborately applied, by the unanimous judgment of the supreme court of Michigan, to a case substantially like the present, in *Rice v. Ruddiman*, 10 Mich., 125; and the opinion in that case distinctly recognizes the title of the riparian owners to the land under water, so far out into the lake as it can be made beneficial for personal and private use, subject only to the paramount public right of navigation and other public rights incident thereto. See further Tyler's Law of Boundaries, 64; *Gough v. Bell*, 2 Zab., 441; *Grant v. Davenport*, 18 Iowa, 178. 3. That the plaintiff, as riparian owner, could not be cut off from the water without due compensation made. *Chapman v. O. & M. R. R. Co.*, 33 Wis., 629. No supervening right over the lake front can be exercised without consent of the adjoining proprietor. *Bowman's Devisees v. Wathen*, 2 McLean, 376; *Duke of Buccleuch v. Metropolitan Board*, L. R., 5 H. L., 418. No one can occupy for his individual purposes the water front of a riparian proprietor, and the attempt of any person to do so would be a trespass. *Rice v. Ruddiman, supra.*

In an additional brief filed by the respondent's counsel, they argued that the doctrine of riparian rights laid down in *Rice v. Ruddiman, supra*, and the various uses made of the shores and beds of our lakes by riparian owners, and sanctioned by judicial authority, such as the construction of piers, embankments, etc., may be upheld, *in the absence of any definite common-law rule in this state*, upon the following grounds, among others: 1. Local custom or usage, recognized by the state, and never interfered with, though quite universal. 2. The fact that the shoal waters are considered part and parcel of the shore (*Strong v. Dutton, supra.*) 3. Because,

the title of the state being merely held in trust for certain public purposes, viz., navigation and rights incident thereto, there is no reason in asserting these public rights beyond the navigability of the lake. *Cessante ratione legis, lex ipsa cessat.* 4. The fact that the title of the state is but a sovereign title, and not proprietary.

RYAN, C. J. I. A strong appeal was made to us by one of the counsel of the appellant, to change, in this case, the rule of property arising upon one of the plats of the city of Milwaukee, established by this court in *Emmons v. Milwaukee,* 32 Wis., 434. And some of the authorities cited by the distinguished gentleman lent great force to his argument. *Rowan v. Portland,* 8 B. Mon., 232; *Alves v. Henderson,* 16 id., 131. The court was not referred to those cases in *Emmons v. Milwaukee;* and it is now impossible to say, had they been then cited, what influence they might have had on the judgment in that case. It is not impossible that, if the construction of the plat now again relied upon, had been as well presented in that case as in this, it might have been adopted by the court. The present chief justice could hardly have expected his views of that case, then overruled by the court, to be now adopted by the then chief justice. But, whatever the former may have thought or still think of the reason of the rule in *Emmons v. Milwaukee,* he quite agrees with his brethren that it is now too late to disturb that case. Such a rule of property, once deliberately established, should be sure and stable. It would be an evil worse than any error in the reason of the rule itself, that it should be open to review and change as often as doubts might be suggested of its original soundness. Broom's Legal Max., 111.

It was also suggested that the construction of the plat given in *Emmons v. Milwaukee* was not essential to the judgment in that case, and was therefore *obiter dictum.* But it is within the memory of us all, that the counsel on both sides in that

case pressed the court to determine upon that appeal the true construction of the plat, whatever might be the judgment of the court. This the court accordingly did; and so the rule laid down became *res adjudicata* in that case. The judgment was in favor of the city, though the rule of construction was against it. Therefore the city moved for a rehearing upon the sole ground that the construction of the plat given in the opinion of the court was erroneous; and the motion was elaborately argued on both sides upon that question. The court overruled the motion, thereby again affirming the construction of the plat. It might have been more provident not to have determined the rule until the record presented the question directly. But it is now too late to hold that the rule affirmed and reaffirmed in that case, and which determined finally the rights of the parties to it, is, as to other cases, mere *obiter dictum*. As to all cases involving it, it must be taken as the settled construction of the plat by this court.

It was contended that some parol evidence distinguishes this case from *Emmons v. Milwaukee*, and tends to establish a dedication *in pais* of the strip of land upon the margin of the lake. Undoubtedly the owners of the land who made the recorded plat, might, by a subsequent and independent act *in pais*, dedicate to the public land reserved to themselves by the plat. But we cannot think the evidence in question tends to establish any such independent act. We think that it tends rather to put a construction on the plat, that the plat itself had operated as a dedication of the strip in question. And, notwithstanding some things which might be implied from *Barclay v. Howell*, 6 Peters, 498, and perhaps from *Gardiner v. Tisdale*, 2 Wis., 153, it would be wild heresy in law to enlarge the operation of the plat by the parol construction of those who made it, or of the public who may have claimed under it. When the plat was recorded, it furnished the exclusive rule for its own construction for all time, unless reformed by judicial decree.

We are therefore obliged to affirm the title of the respondent, so far as it is within the rule of *Emmons v. Milwaukee,* that is, within the strip of land to the natural shore of lake Michigan.

II. But the title asserted by the respondent in this case is not within the strip of land bounded by the natural shore of the lake; but is land made outside and in front of it, upon the natural bed of the lake.

It appears that, several years ago, the respondent, or some one under whom he claims, built an embankment into the lake, extending some eighty-five feet from the natural shore, in front of the land which he owns within the strip. And it is upon his title to this embankment that the respondent's recovery in this case directly rests.

The title of the respondent, and of all persons under whom he claims, as riparian owners of land bounded by the lake, went to the natural shore of the lake, and was limited by it. To the bed of the lake within its natural shore, neither they nor he took any title as riparian owners. The title, as well as the use, of the bed of the lake is in the public.

Several cases involving several questions of riparian right have been considered by the court with this, and are decided at the same time. *Boorman v. Sunnuchs; Delaplaine v. C. & N. W. Railway Co.; Olson v. Merrill.* These cases presented questions of riparian right upon Lake Michigan, upon lesser navigable lakes, upon mere ponds not navigable, and upon running streams. They were argued at the bar with much learning and ability, and have been thoroughly investigated and considered by the court. In these cases, we have reached, amongst other, the following conclusions, having more or less bearing on our judgment in this case.

*First.* Adhering to the uniform rule of decision in this court, as will be seen in *Olson v. Merrill (ante,* p. 203), that a riparian owner upon a river or stream, navigable or unnavigable, takes, in the absence of express limitation in his title,

*usque ad medium filum aquæ*, the court holds, in *Boorman v. Sunnuchs* (*ante*, p. 233), and *Delaplaine v. Railway Co.* (*ante*, p. 214), as in this case, that upon a natural lake or pond, the riparian owner, as such, takes only to the natural shore of the lake or pond.

*Second.* Riparian rights proper are held to rest upon title to the bank of the water, and not upon title to the soil under the water; riparian rights proper being the same, whether the riparian owner owns the soil under the water or not. And, distinguished from the right arising in case of gradual and insensible accretion or reliction, the general right of appropriating and occupying the soil under the water, when such right may exist, is not properly a riparian right; resting not upon title to the bank only, but more directly upon title to the soil itself under the water.

*Third.* Distinguished from appropriation and occupation of the soil under the water, a riparian owner upon navigable water, whether or not he own the soil *usque ad medium filum aquæ*, and unless prohibited by local law, has a right to construct in shoal water, in front of his land, proper wharves or piers, in aid of navigation, and at his peril of obstructing navigation, through the water far enough to reach actually navigable water; this being held to further the public use of the water, to which the public title under the water is subordinate; and therefore to be, in the absence of prohibition, passively licensed by the public, and not a pourpresture.

*Fourth.* As a right of necessity, when water, navigable or not navigable, is by natural causes wearing away and intruding upon its banks, the riparian owner, whether or not he own the soil *usque ad medium filum aquæ*, may, as against the public, at his peril of obstructing the public use when the water is navigable, and at his peril of the necessity, intrude, as far as may be necessary, into the water, for the construction of works necessary to the protection of his land against the action of the water.

*Fifth.* Without express and competent grant from the public, the rights declared in the foregoing third and fourth conclusions, are the only rights of a riparian owner, upon navigable water, to extend his possession beyond or intrude within the natural shore of the water. Any other extension or intrusion into the water, beyond the natural shore, whether made by the riparian owner or a stranger, is a pourpresture, vesting no title in him who made it.

It is well to explain here that in speaking of water as navigable or not navigable, we do not use the words in their sense at the common law. Waters at the common law were called navigable, only when affected by the ebb and flow of the tide. Of course in this state, bounded on one side by a great fresh-water sea, and on another by a great river, which with its confluents constitutes perhaps the most extensive inland navigation in the world, and having within it many streams and bodies of water capable of navigation and actually navigated, there is no water subject to the ebb and flow of the tide, or called navigable at the common law. Here, therefore, the restricted sense of the word, navigable, at the common law, is wholly inappropriate to the actual condition of things. Waters are here held navigable when capable of navigation in fact, without other condition. And when we use the terms, navigable or unnavigable, we mean capable or incapable of actual navigation. The confusion on this subject which sometimes occurs by the misapplication of the common-law sense of terms to the very different geographical conditions of this country, and the true sense here of the term, navigable, are well stated in *S. B. Magnolia v. Marshall*, 39 Miss., 109.

The rule that the title of the riparian owner upon a natural lake or pond does not extend beyond the natural shore, appears to be very generally, almost universally recognized, and is discussed by Cole, J., in *Delaplaine v. Railway Co.*, *supra*. It is unnecessary to repeat here what is there said, and in which we all concur. Indeed, the position was affirmed

in this court as far back as *Mariner v. Schulte,* 13 Wis., 692.

The rule that riparian rights rest upon the title to the bank and not to the bed of the water, is also discussed in the same opinion of COLE, J., in which it enters into the judgment of the court more directly than it does in this case, and need not be noticed here at any length. We take it to rest on sound principle, and to be affirmed or implied in a great majority of adjudged cases involving the point. It is distinctly recognized in *Chapman v. O. & M. River R. R. Co.,* 33 Wis., 629. The authority of the latter case was assailed at the bar in *Delaplaine v. Railway Co., supra.* The criticism, however, failed to disclose to us any error in the principles of the decision or in the reasoning of the opinion. We think it amply sustained by the authorities cited in it; and fully supported, if need were, by the later and very able case in the English House of Lords, of *Lyon v. Fishmongers' Co.,* L. R., 1 Appeal Cas., 662, which is a direct and most satisfactory authority in support of the rule under consideration.

The rule that the right of appropriation and occupation of the bed of the water, where such right exists, rests upon title to the bed of the water itself, and not upon title to the bank only, appears to be in principle nearly self-evident. When the riparian owner is seized also of the soil under the water, his title is subject only to public use of the water, and to private rights of other riparian owners. When the water is not navigable, the public has no easement; and the riparian owner may, in general, put his estate under the water to any proper use he may please, not infringing upon the rights of other riparian owners, and not violating any public law. When the water is navigable, he may in general make like use of his estate under the water, subject to the like limitations, and not infringing upon the paramount right of use in the public.

These views are too familiar to call for examination of authorities at length. The principles on which they rest have

been recognized in many cases in this court. *Walker v. Shepardson*, 2 Wis., 384; *S. C.*, 4 id., 486; *Carpenter v. Mann*, 17 id., 155; *Yates v. Judd*, 18 id., 118; *Milwaukee Gaslight Co. v. Gamecock*, 23 id., 144; *Wisconsin River I. Co. v. Lyons*, 30 id., 61; *Arimond v. Canal Co.*, 31 id., 316; *Chapman v. Railroad Co.*, 33 id., 629; and perhaps other cases.

The rule giving to the riparian owner, and limiting, the right to construct wharves and piers into navigable water to the point of actual navigability, is fully sanctioned by *Walker v. Shepardson*, *supra*, in this court, and *Strong v. Dutton* and *Atlee v. Packet Co.*, *infra*, in the federal supreme court.

The rule permitting a riparian owner, as against the public, to intrude as far as may be absolutely necessary, in the construction of works necessary to protect his land against the action of the water, without impairing any public use, appears to us to go little, if any, beyond the rule at the common law. *The King v. The Commissioners, etc.*, 8 Barn. & Cress., 355; *Trafford v. The King*, 8 Bing., 204. So far as it may appear to enlarge the common-law right, we believe it to be necessary to the rights of property on some of the waters of this state, especially on Lake Michigan; and we hold it to be one of many rights founded on the necessities of self preservation. See *Miller v. Milwaukee*, 14 Wis., 642. It may aid in preserving much valuable property; and, guarded as we have guarded it, can work no injury to the public. Whether and how far one riparian owner may exercise this right to the injury of another, or, exercising it, be liable for such injury, are questions on which we indicate no opinion.

It is unnecessary here to discuss these two last rules at any length; because there is no pretense in this case that the respondent's embankment was constructed as a wharf or pier in aid of navigation; and none worth serious consideration that it was designed, and none whatever that it was necessary, to protect his estate bounded by the shore of the lake against the wash of the water. It seems to have been built and used for

the sole purpose of extending into the lake his possession bounded by the lake. We have stated these rules here, chiefly that our general conclusions upon the general subject, here grouped together, may fully and clearly appear, without risk of misapprehension.

The rule that where the fee of the bed of the water is in the public, the general right of the riparian owner is confined to legitimate uses of the water only, appears to follow of necessity from the principles already stated. It is difficult to perceive, how, in that case, the riparian owner could take right to intrude upon the public fee under the water, which he might not take to intrude upon the private fee bounding his estate upon the land side. This is especially apparent when the water is navigable, and the use of the water, as well as the fee in its bed, is in the public. In that case, all riparian right is subject both to the fee and to the use; and the riparian owner takes no right to intrude upon either.

And the reason of the rule applies equally, whether the water immediately next the shore be shoal or deep. For the fee is equally in the public; even the shoal water next the shore may aid the public use, and may deepen or be deepened, so as to become practically capable of navigation. It is difficult to perceive on what principle the right of public use in shoal water next the banks is to be distinguished from the right of public use in shoal water on bars or other natural obstructions in the channel of navigable waters. The public has a right to extend the actual capacity of use everywhere within the banks; making the public use coextensive with the fee. *Wis. R. I. Co. v. Lyons*, 30 Wis., 61.

Practically, in such a case as this, if a riparian owner might appropriate to himself, by embankment, the public fee under shoal water next the bank, his embankment might well in time cause the navigable water outside of it to become shoal in its turn, as seems to have happened in this case; whereupon the right to intrude upon the public fee would again

AUGUST TERM, 1877.          267

Diedrich vs. The N. W. U. R'y Co.

accrue, and so on from time to time indefinitely; thus equally intruding upon the public fee and impairing the public use.

Be that as it may, it is conclusive against the right of private appropriation claimed, that, in such a case, the riparian owner takes neither fee nor use in the bed of the water adjoining his riparian possession.

These views are so clearly founded on principle, that we think we could entertain no doubt of them, even if they had not been expressly adjudicated. But there are cases upon the point, adjudged by very high authority, and quite satisfactory to us.

The limitation of the right of the riparian owner upon navigable water to intrude through shoal water upon the bed of the water, for the erection of wharves or piers in aid of navigation only, is clearly implied by the whole discussion of the court in *Strong v. Dutton*, 1 Black, 23. The point was not directly involved in that case; but appears to have been in the subsequent case of *Atlee v. Packet Co.*, 21 Wall., 389.

In the latter case the riparian owner had saw mills on the bank of the Mississippi river; and, as part of a boom for receiving and retaining saw logs, had built a pier in the river, disconnected with the shore, in water ten or twelve feet deep. Of this pier, it is said in the opinion of the court: " Some kind of a boom was necessary to enable him (the riparian owner) to keep these logs safely and economically. No question is made but that if he had a right to build a pier at that place, it was built with due skill and care."

After discussing the rights which a state may confer upon municipal corporations to construct landings upon navigable waters, the court proceeds thus:

" The wharves or piers are generally located by lines bearing such relation to the shore and to the navigable water as to present no danger to vessels using the river, and the control which the state exercises over them is such as to secure at once their usefulness and their safety.

" These structures are also allowable in a part of the water which can be used for navigation, on the ground that they are essential aids to navigation itself.

" The navigable streams of the country would be of little value for that purpose, if they had no places where the vessels which they floated could land, with conveniences for receiving and discharging cargo, for laying by safely until this is done, and then departing with ease and security in the further prosecution of their voyage. Wharves and piers are as necessary almost to the successful use of the stream in navigation as the vessels themselves, and are to be considered as an important part of the instrumentalities of this branch of commerce. But to be of any value in this respect, they must reach so far into deep water as to enable the vessels used in ordinary navigation to float while they touch them and are lashed to their sides. They must of necessity occupy a part of the stream over which a vessel could float if they were not there."

Having stated that the riparian owner had no statutory or municipal authority, the court proceeds:

" Nor is there any claim or pretense that this pier is in aid of navigation. No vessel or watercraft is expected to land there, nor are there any arrangements by which they can land or be secured or fastened. The size of the pier, its sharp corners, its elevation from the water, and its want of connection with the shore, forbid any such use of it. It is intended to receive nothing that floats but rafts, and no rafts but such as its owner designs to keep there permanently for his own use.

" He rests his defense solely on the ground that at any place where a riparian owner can make such a structure useful to his personal pursuits or business, he can, without license or special authority, and by virtue of this ownership, and of his own convenience, project a pier or roadway into the deep water of a navigable stream, provided he does it with care,

and leaves a large and sufficient passway of the channel unobstructed.

"No case known to us has sustained this proposition, and we think its bare statement sufficient to show it unsoundness.
\*    \*    \*    \*

"We are of opinion that the pier against which libellant's barge struck, was placed by him (the riparian owner) in the navigable water of the Mississippi river without authority of law, and that he is responsible for the damages to the barge and its contents."

The rule of that court, when not controlled by state decision, is, that riparian owners upon navigable streams take only to the shore, and not *usque ad medium filum aquæ*. That makes the conditions of that case, in their view, so far the same as in this. The principle on which the decision rests is perhaps not very clearly stated; but it appears to us that it rests, and the reasoning of the court throughout goes to show that it does rest, on the principle that a riparian owner upon navigable water can not intrude upon the bed of the water, save only by piers or wharves in aid of navigation. If, in that case or in this, the riparian owner could of right appropriate to his own use the bed of the water under shoal to navigable water, it would be immaterial whether he should build outwards from the shore, or, as in that case and in this, first construct a pier reaching navigable water, and then, as in this case, connect it by embankment with the shore. The pier in that case was held to be a pourpresture, because it was there, not in aid of navigation, as the bridge pier in *Strong v. Dutton*, but in aid of the riparian owner's convenience on the bank; not in aid of the public use of the water, but in aid of the private uses of the land. Surely, after the judgment in that case, the riparian owner could not have legalized his pier by connecting it with the shore by embankment. The court does not rest its judgment upon the disconnection of the pier from the shore. The pier was held to be unlawful, not because

it was disconnected with the shore, but because the riparian owner had no right to intrude where it was, upon the public fee and the public use.   The court puts the pier upon the same ground as a roadway to the same point; clearly covering such an intrusion as that in the case before us.   It appears in that case that part of the water was shoal between the pier and the shore; and we apprehend that it would not have changed the view of the court, had the water been shoal the entire distance. For the court very plainly intimates that a pier in aid of navigation, in the same place, would have been a lawful structure within the rule of *Strong v. Dutton.*

A still more satisfactory case in support of our views, is *Austin v. Rutland R. R. Co.*, 45 Vt., 215.   That case arose in regard to land bounded by Lake Champlain, in which the court held that the riparian owner took no title in the bed of the lake beyond the shore.   A stranger made land upon the bed of the lake, in front of the riparian owner's estate, into navigable water, with wharves upon the lake side.   The riparian owner brought ejectment for the land so made in front of him.   The court appears to have assumed that, had the riparian owner himself, as such, a right in the bed of the lake, to intrude such an embankment upon it into navigable water, the embankment built by a stranger would enure to him, as a house built by a stranger enures to the owner of the land.   The court therefore considers the right of the riparian owner to extend his possession to navigable water; and holds that " all that could be claimed for the riparian owner is the exclusive right to pass to and from the shore, as it originally was, from and to the lake, but no peculiar or additional right to the lake itself."   " There is no common law of Vermont by which the owner of land bounded on Lake Champlain has a right beyond low-water mark to appropriate as his own the bed of the lake."   The court suggests that the riparian owner may have a remedy against the land intruded between him and the lake,

as a nuisance; but holds against him in the ejectment, for want of title in land made on the bed of the lake.

The opinion of the court is able and learned, discussing at some length the English and American authorities on the subject. And we are quite satisfied that it states the true rule which should prevail in this state.

There are, indeed, cases more or less conflicting with this view, of which we shall notice but one or two.

The true ground of the rule in *Rice v. Ruddiman*, 10 Mich., 125, that the riparian owner takes *usque ad medium filum aquæ* upon Muskegon lake, is that the lake is only a widening of the river. With the same view of the lake, we should hold the same view of the law. It is true that some of the opinions speak of extending the same rule of ownership *usque ad medium filum aquæ* to all small lakes within the state; but not so to lake Michigan. It is also true that some of the opinions speak, and we cannot help thinking somewhat loosely, of some measure of riparian right of use, " not exclusive or unrestricted," of the bed of navigable waters, under shallow water by the shore. We have considered what is there said, with great attention and the deference due to the great learning and ability of the court. But we cannot help thinking that even such a qualified right of intrusion into the shoal water of navigable streams or bodies would tend to the result accomplished in *Yates v. Milwaukee*, 10 Wall., 497, where it was held that the public authorities, in the process of rendering navigable to its full width a public river, could not, whether the fee under the water were in the public or in the riparian owner, remove a solid pier or embankment intruded by the riparian owner in shoal water into the river and upon the public use, without making compensation for it. Such a result of permissive private intrusion upon public right is pregnant with warning against the permission. We cannot help regarding the latter case as an ex-

ceptional one, inconsistent with many better considered cases in the same court. We think that the true measure of right is the rule in *Strong v. Dutton*, and we are not sure that the supreme court of Michigan meant anything more.

We have here taken no notice of the exact line of boundary upon lakes or ponds; whether it be high water or low water, or the water's edge; the exact line of boundary being immaterial in the case of so extended an intrusion.

With these views, it is hardly necessary to add that, in our judgment, the respondent wholly failed in sustaining his title to the *locus in quo*.

III. If the railroad had been constructed in front of the respondent's estate in the strip of land upon the natural shore of the lake, so as injuriously to affect his riparian right, we admit that he would be entitled to damages for the injury. *Delaplaine v. Railway Co., supra*. But that is not the respondent's claim in this proceeding. He claims, not for the injury to his riparian right, but for land taken of which he is seized. Whether or not he had lost or impaired his riparian right, by the construction of the embankment in front of it, is a question not before us in this case, and on which we indicate no opinion.

IV. We have not considered the right of the railroad to go where it does. As in ejectment, a party seeking compensation in such a proceeding as this, must recover on the strength of his own title; and until he prove title in himself, is in no condition to question the right of the other party.

*By the Court.* — The judgment of the court below is reversed, and the cause remanded for a new trial.

On a motion by the respondent for a rehearing, the following opinion was filed:

RYAN, C. J. The argument of the learned counsel for the respondent, upon the motion for a rehearing of this appeal,

imputes to the former opinion in this case error of fact, and not of law.

The counsel reproves us for calling the respondent's structure in the lake, an embankment; and says that it is only a breakwater to protect the respondent's land abutting on the lake. If there really be such error in fact, we think that it is in the case made, and not in the judgment of the court. The respondent, in his notice of appeal to the court below, describes what we call an embankment, as " a piece or parcel of land," etc. And our reading of the testimony has led us to believe that description to be correct in calling the *locus in quo* land; land made by embankment in the lake.

But if we be mistaken in this, and if the track of the rail-road be not over an embankment made to extend the respondent's possession into the lake, but over a breakwater only, made to protect his possession in the land bounded by the natural shore of the lake, we do not see how it can avail the respondent.

For, whatever it be, the respondent in his notice claims as the owner of it in fee simple. Pretermitting the question of the respondent's right to construct a breakwater for the protection of his land, some eighty-five feet into the lake, without proof of the necessity of so great or any intrusion upon the public fee under the lake, we are wholly at a loss to comprehend how the respondent could acquire a fee by a breakwater, which it appears to be now conceded that he could not by embankment. Indeed, the claim of private confiscation of the public fee appears to us to be more plausible by embankment, than by breakwater. For the former would appear to be the more permanent of the two, and more clearly to imply a possessory right.

In the respondent's notice of appeal, he does not claim that the appellant has destroyed or impaired a breakwater, but that it has taken a strip of land. Passing by the variance between the respondent's claim and his counsel's brief, we are

unable to perceive an injury to the respondent for which he could recover in this proceeding, by the railroad's passing over the breakwater of the brief, without injury to it as a breakwater in the protection of the land bounded by the shore of the lake.

*By the Court.* — A rehearing is denied.

NOTE. After this motion had been submitted, the counsel in the case entered into a stipulation postponing the hearing of the motion. But the court held it too late; holding also that, even before submission, time under rule XX concerned the court as well as the parties, and could be enlarged by order of the court only.