J. ENSIGN FULLER *et al.*

*v.*

CHARLES B. SHEDD *et al.**

*Filed at Springfield January 17, 1896—Rehearing denied June 3, 1896.*

1. WATERS—*all meandered lakes subject to same rules as to riparian rights.* Lakes, whether large or small, if they are of such size that in making the original survey they are meandered, are subject to the same rule as to riparian rights.

2. SAME—*riparian boundaries—effect of leaving narrow strip between meander line and natural boundary.* A narrow strip of land between a meander line and a natural boundary, such as a stream or river, if it is much smaller than the land granted, will be included in the grant, and the center of the stream or river will be the boundary, unless a different intention is manifested by the terms used.

3. SAME—*when meander line is the boundary of a riparian owner.* Land outside the meander line of a grant, if so grossly in excess of the land sold as to make it apparent that there is fraud or mistake in the survey, will not be included in the grant, but the meander line will be the boundary.

4. SAME—*what law determines riparian rights.* The rights of owners of lands situated in Illinois and bounded upon a meandered lake are to be determined by the law of Illinois as held by its courts.

5. SAME—*grant on meandered lake extends to water's edge only.* A grant of land bounded on a meandered lake conveys only to the water's edge with riparian rights, but does not include land under the water. (*Trustees of Schools* v. *Schroll*, 120 Ill. 509, adhered to and followed.)

6. SAME—*riparian rights are protected by law.* Riparian proprietorship is a property right of value, to which are attached rights and privileges conferred by law, of which the owner cannot be deprived by an illegal proceeding.

7. SAME—*water and underlying lands of meandered lakes belong to the State.* The waters of meandered lakes, and the land covered by them, are held by the State in trust for all the people, who alike have benefit thereof in fishing, boating, and the like.

8. SAME—*second survey within meander line void.* A re-survey of lands, mostly covered with water, within the meandered line of a lake, no fraud or mistake being alleged in the original survey, and

---

*With the above were also decided the following cases: *Franklin A. Cleaveland* v. *Gertrude H. Hardin; *Elizabeth P. Thomas* v. *Charles B. Shedd; Charles E. Rand* v. *Gertrude H. Hardin;* and *South Chicago and Southern Railroad Co.* v. *Charles B. Shedd et al.*

when but slight changes in the conditions have taken place, can not be made by the land department and the land therein patented to other persons, thereby destroying the riparian rights of those holding under the original grants.

9. SAME—*effect of gradual recession of waters—reliction.* Gradual recession of the waters of a meandered lake gives riparian proprietors the right to the new land by following the recession of waters to their edge, but a considerable body of new land suddenly or perceptibly formed by reliction will belong to the State.*

10. COURTS—*jurisdiction of local and Federal courts.* The right of State courts to determine the local law in respect to riparian rights on meandered lakes under patents from the government, is more important than the right of Federal courts to construe such patents.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge presiding.

On the 29th of June, 1888, Charles B. Shedd filed his petition under the Burnt Records act, seeking to establish the record title to fractional section 29, in township 37, north, range 15, east of the third principal meridian, in Cook county, Illinois. The United States issued letters patent for this fractional tract of 7.37 acres to Stephen A. Douglas on October 1, 1855. On the 30th of June, 1888, Shedd filed another petition under the Burnt Records act, seeking to establish the record title to the south-east quarter of fractional section 20, in township 37, north, range 15, east of the third principal meridian, for which the United States issued letters patent for the fractional tract of 4.53 acres to Horatio B. DeWitt on March 1, 1848. To each of these petitions a number of parties were made defendants, some disclaiming interest, others being defaulted, and others filing answers, and certain defendants answered and also filed cross-petitions bringing into court other defendants. Certain other parties intervened and became parties defendant, and answered and filed cross-petitions.

*The conflicting authorities on ownership of the beds of lakes are collected in a note to *Gouverneur* v. *National Ice Co.* (N. Y.) 18 L. R. A. 695.

It would be beyond the reasonable limits of an opinion to state the various averments of the petitions, answers, cross-petitions and the answers thereto, appearing in this voluminous record. For the questions arising in this record we will briefly abstract the cross-petitions of Gertrude H. Hardin, and the answers and cross-petitions of J. Ensign Fuller, Conrad N. Jordan, John I. Bennett, Frank I. Bennett, Franklin A. Cleaveland, Elizabeth P. Thomas, Charles E. Rand and the South Chicago and Southern Railroad Company.

Gertrude H. Hardin avers she is the owner in fee of the south-east fractional quarter and the east fraction of the south-west fractional quarter of section 19, the north-east fractional quarter and the east fraction of the south-east fractional quarter of section 30, township 37, north, range 15, east of the third principal meridian, which lands were by the United States, by letters patent, conveyed to John Holbrook on May 20, 1841. These fractional tracts so claimed to be owned by Shedd, who filed the original petition, and by Gertrude H. Hardin in her cross-petition, are lands surveyed for the United States in 1834 and 1835, and were adjacent to a lake lying partly in Indiana and partly in Illinois, known as Wolf lake. The lands so surveyed were meandered on the lake, and were subsequently conveyed as stated. By *mesne* conveyances Shedd acquired title to the lands above described as being patented to Douglas and DeWitt. Of the lands entered by Holbrook, Gertrude H. Hardin acquired title by descent and *mesne* conveyances. Wolf lake, as thus meandered, comprised a body of water covering several thousand acres of land, and when originally surveyed was believed to be a navigable lake, and was so designated by the field notes of the surveyor in the original survey. The plat of the original survey may be given as follows, so far as the lake is within the State of Illinois:

·In pursuance of a circular issued by the general land office on July 13, 1874, a survey of all lands within the meandered lines was made, including not only that above the water but also that then covered with water, which was of but slight depth. This survey was reported to the general land office of the United States and approved, and the lands so surveyed offered for sale and sold to various parties. The lands as thus surveyed and sold were platted as shown by the annexed diagram:

161—30

Between fractional section 29 and fractional south-west quarter of section 20 owned by Shedd, as shown by the evidence, there existed at the time of the original survey a ridge which was but slightly covered with water, and at several points along this ridge islets existed, one having trees growing thereon. From that part of Wolf lake in the State of Indiana there was a shallow, marshy connection with Lake Michigan, but by reason of the action of the waves in Lake Michigan a sand-bar

had been formed, which, except under certain conditions, prevented the flow of water directly from Wolf lake into Lake Michigan. An outlet from the west side of the lake connected with the Calumet river, through which the water flowed from the west part of the lake. At different seasons of the year, as early as 1841, the ridge was often above the level of the lake, and in the course of a few years the ridge materially increased in width and was above the level of the water at ordinary stages. The land on the ridge and around the margin of the lake thus above the mean level of the lake existed in 1874, at the time the circular was issued by the general land office for the second survey which is above shown.

The second diagram above, however, does not show the lands between the meandered line and the water as it was at the time of survey in 1874, nor does it show the ridge which, at ordinary stages, was above the water and contained a large number of acres of dry land. The diagram is used, not as showing the dry land on the ridge and margin of the lake within the meandered lines, but as showing the lines of the survey of 1874. By reason of this ridge the water was divided into two lakes, that to the east known as Wolf lake and that to the west called Hyde lake. The land within the meandered lines, which was the bed of the lake as surveyed and platted in 1835 and which was sold by the United States after the survey of 1874, was purchased by different persons.

The cross-petition of Conrad N. Jordan avers he is the owner of the south half of the north-west quarter and the north half of the south-west quarter of section 29, and also of the west half of the south-west quarter of section 20, the south half of the east half of the south-west quarter of section 20, and lot 2 of the south-west quarter of section 20, and also that he is the owner in fee simple of lots 2 and 3 in the south-east quarter of section 20 and the east half of the north-east quarter of section 30, the north-east quarter of the south-east quarter of section

30, and lot 3 of the south-east quarter of section 30, except 19.28 acres off the south side thereof, all situate in township 37, north, range 15, east of the third principal meridian, in Cook county, Illinois.

Franklin A. Cleaveland avers he is the owner of 19.28 acres off the south side of lot 3, in the south-east quarter of section 30, township 37, north, range 15, east of the third principal meridian.

Elizabeth E. Thomas avers she is owner of the south-east quarter of the south-west quarter and the south-west quarter of the south-west quarter, excepting 7.37 acres in the south-west corner thereof, all in section 29, township 37, north, range 15, east of the third principal meridian.

Charles E. Rand avers ownership of all that part of lot 1 of the north-east quarter of section 30 lying west of a line 832 feet east of and parallel to the west line of said north-east quarter of section 30, township 37, north, range 15, east of the third principal meridian.

J. Ensign Fuller avers ownership of lots 2 and 3 of the south-east quarter of section 19, and the south-east fractional quarter of the east fraction of the south-west fractional quarter of section 19, township 37, north, range 15, east of the third principal meridian, and of tax titles on other lands.

By its answer the South Chicago and Southern Railroad Company sets up as against Shedd and Hardin, and alleges it owns, the right of way of its road over land described, which it acquired from parties holding under the 1874 survey.

These averments in the cross-petitions of Conrad N. Jordan, Franklin A. Cleaveland, Elizabeth E. Thomas, Charles E. Rand, J. Ensign Fuller and the South Chicago and Southern Railroad Company are of title by means of conveyances by the United States, by letters patent, of the lands included in the survey of 1874, which, by *mesne* conveyances, became vested in them severally, as alleged in their answers and cross-petitions and certain tax titles.

Frank I. Bennett avers that fractional section 29, 7.37 acres, was sold for a special assessment levied by the South Park Commissioners, and he became the owner of the undivided half thereof by *mesne* conveyances, and James W. Converse was the owner of the other undivided half, and he, Bennett, had conveyed, by deed delivered in escrow to John I. Bennett, his interest, conditioned that John I. Bennett should have Converse convey his interest. John I. Bennett filed cross-petitions for specific performance, as against Converse, averring ownership in certain lands by tax title, and averring equitable interest in lands claimed to be owned by Shedd and Jordan, and claiming riparian ownership as to lands adjacent to fractional section 29. John I. Bennett and Fred F. Bennett, by cross-petition to the cross-petition of Hardin, aver tax title in fractional north-east quarter of section 30, title to which was alleged to be vested, the half interest in said tract in John I. Bennett and the quarter interest in Fred F. Bennett. Cross-petitions were filed by Andrew Crawford, James W. Converse, and others. In most of these cross-petitions, other than that of Mrs. Hardin, the defendants aver occupancy and possession, and set up the Statute of Limitations, etc.

We do not deem it necessary to further state the pleadings or the evidence here. Issues being made, on hearing the court entered a decree dismissing all the cross-petitions except that of Gertrude H. Hardin, and decreeing title in Shedd and Mrs. Hardin to the lands in their respective petitions described, and that as riparian owners they took the bed of the lake to its center, and all lands above the waters as well as those covered by the waters, and that the survey of 1874 was invalid, and the titles to lands sold by the United States and patented, describing the lands within the meandered lines, were void as against such riparian owners, and the tax titles were void. The court further found that the fractional south-west quarter of section 20, at the time of the survey in 1835, extended

to the south line of the section, and that the fractional section 29, at the time of the survey in 1835, extended to the quarter section line north, and both points were dry land at the time of the survey above mentioned. There was some contention as to the respective rights of Hardin and Shedd as to their lines. From that decree this appeal was prosecuted by J. Ensign Fuller, Conrad N. Jordan, John I. Bennett, Frank I. Bennett, Franklin A. Cleaveland, Elizabeth E. Thomas, Charles E. Rand and the South Chicago and Southern Railroad Company. Mrs. Hardin also assigned errors which were afterwards withdrawn. The errors assigned by each are substantially the same as to their merits, viz., that the court erred in holding that the patents from the United States, under the survey of 1834 and 1835 of lands bounded by the lake, extended to the lands under the lake, and in holding the meander line of that survey was not a line of boundary, and that the survey of 1874, and the patents issued thereunder, were invalid and void, and in holding that there was no possession adverse to Shedd and Hardin by actual residence for seven years, and in holding that the better title was not in the claimants under the second patents, and in dismissing the cross-petitions of such claimants.

GREEN, WILLITTS & ROBBINS, for appellants J. Ensign Fuller, Conrad N. Jordan, John I. and Frank I. Bennett.

LOESCH BROS., for appellant the South Chicago and Southern Railroad Company.

MARSTON, AUGUR & TUTTLE, for appellant Elizabeth P. Thomas.

S. P. DOUTHART, for appellant F. A. Cleaveland.

ROBERT B. KENDALL, for appellant Charles E. Rand.

WILLIAM H. PRESCOTT, LYMAN & JACKSON, and H. S. MECARTNEY, for appellee Charles B. Shedd.

DENT & WHITMAN, (MORAN, KRAUS & MAYER, of counsel,) for appellees Gertrude H. Hardin and Cook County Canal and Dock Company.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The main question presented on the pleadings and facts appearing in this record is, whether the title of the riparian owner on a lake meandered in the original survey by officers employed by the United States for surveying public lands, extends to the center of the lake or stops at the water's edge. The question is of much consequence and deserving of careful consideration. In States bordering on the great lakes of the north it is of paramount importance, and the adjudications of the courts of such States are not harmonious. Where lakes are of such size that in making the original survey they are meandered, we know of no principle of construction by which one rule should be applied to small lakes and another to large ones. (*Bradley* v. *Rice*, 13 Me. 201.) The impossibility of establishing a reasonable rule that a right should be determined by the extent of a lake, would, in the absence of legislation determining that question, lead to conflicting and absurd conclusions, based on no rule regarding the effect of a survey of lands bordering on a lake. The real question must be resolved by determining whether the riparian owner of lands meandered on a lake by the original survey takes to the water's edge as meandered, or takes to the center of the lake.

The body of water marked "Navigable Lake" in the original survey is a lake two or three miles long from east to west and about the same north and south, the greater part being in the State of Indiana. That part in Illinois at the time of the original survey covered about 1300 acres of land. This lake is situated three or four miles south of Lake Michigan and in the State of Indiana, and has a natural outlet towards the north-east into

the latter lake, which outlet is frequently subject to interruption by the formation of a sand-bar upon the shore of Lake Michigan.   There was also an outlet at the west side of the lake into Calumet river.   The effect of winds and storms on Lake Michigan which would raise its water at the south would also operate to change the level of the water in this small lake and cause it to be higher. Its level was also affected by rains and evaporations. From the north-east corner of the south-west quarter of fractional section 20, township 37, north, range 15, east of the third principal meridian, there extended in a southerly direction a ridge.   From the south-east corner of fractional south-east quarter of section 30 and the southwest corner of fractional section 29 a ridge extended in a northerly direction.   The extent to which this ridge projected from the north was about 220 rods and the extent of the projection from the south was about 160 rods. The width of these ridges varied, at some places being 28 rods wide and at others wider, and they were dry land at ordinary stages of water.   At other places they were still narrower.   This was the case at the time of the original survey.   Along these ridges, in their projections from the north and south, trees of different varieties grew, some of which were three feet in circumference. These points, at their extremities, were about 80 or 90 rods apart, and between them, and along the sides of the ridge and around the margin of the lake within its meandered line, reeds and coarse grass grew in the water.   In the marshy depressions between these points were two islands, one a mere knoll, the other containing about one or two acres, on which trees and bushes grew.   This was substantially the physical condition, in ordinary stages of water, at the time of the 1834 and 1835 survey.   The level of the waters of Lake Michigan at a certain stage was adopted as the starting point of levels in Cook county.   The extreme rise and fall of that lake is from five feet above datum to one foot below datum.   The level

of the waters of Wolf lake, when the same reach about the meandered line of the original survey, would be about 2.2 feet above datum. Whilst in the original survey this Wolf lake was by the field notes designated a navigable lake, it was not navigable in fact. Such being the surrounding conditions at the time of the original survey, the changes from that time to the survey of 1874 were not great, such as existed resulting from the slow filling of the lake bed and from other natural causes. Since the survey of 1874, by reason of the improvement of Calumet river and the wearing out of deeper natural channels from the lake and an increased flow therefrom, and the same natural causes continuing to raise the bed of the lake, there has been a recession of the waters, causing dry land on both sides of the ridge, and around the borders of the lake the recession was such that between the meandered lines and the water there was uncovered, and the greater part of the year was dry land around the lake, a strip 20 to 25 rods wide.

In this condition of the lake a survey of the lands and lake bed within the meandered line was made in 1874, and the lands thus surveyed offered for sale and sold, and patented by the United States to various parties, and the greater part of said lands so patented by *mesne* conveyances came to appellants, as alleged in their respective cross-bills. At the time this survey was made the evidence showed the waters were waded by the chain-men, though differing in depth from a few inches to about five feet, and almost all the land surveyed was then covered by water. The lands in the original survey, as made in 1834 and 1835, bordering on the lake, were meandered, and these fractional tracts so sold were patented by the United States to the purchasers thereof. So far as we have occasion to decide the questions in this record we need refer to none but the entries of Holbrook, De-Witt, Egan and Stephen A. Douglas. Douglas had entered fractional section 29, 7.37 acres, and DeWitt had entered the fractional south-west quarter of section 20,

4.53 acres. These lands, by *mesne* conveyances, became vested in Shedd. Holbrook entered the south-east fractional quarter of section 19, 79.11 acres, the north-east fractional quarter of section 30, 28.71 acres, and the east part of the south-east fractional quarter of section 30, 2.04 acres, and the title to the same passed by descent to Gertrude H. Hardin, who also acquired the title to the west fraction of the south-east fractional quarter of section 30, 25.09 acres, which had been entered by William E. Egan. Shedd filed his petition to have his record title established in the lands so acquired by him, and Mrs. Hardin by her cross-petition sought to have record title established to the lands in her cross-petition described, which she had acquired as above stated. The numerous purchasers of lands within the meandered lines under the survey of 1874 having acquired and set up their titles, by cross-petition asked relief in the same manner as to the confirmation of their titles. By the decree of the circuit court of Cook county all the cross-petitions were dismissed except that of Mrs. Hardin, and the court established title in Shedd and Hardin, and held they, by riparian rights, acquired title to the bed of the lake and took to its center. By this decree purchasers of not exceeding 153 acres of land from the government acquired title, *eo instanti,* to the bed of the lake and to more than 1100 acres of land in addition to that for which they paid.

The chief argument of appellants is, the meander line in this case constitutes the boundary. At common law the title of a riparian proprietor bounded by a navigable stream extends only to high-water mark, and in streams not navigable the rights of the riparian proprietor extended to the middle thread of the current. But at the common law, arms of the sea and only streams where the tide ebbed and flowed were deemed navigable, and streams above tide-water, though navigable in fact, were not deemed navigable in law. Under this rule of the common law the principle was applied at an early period

in the history of the State, and held with reference to streams in and bordering this State, that the riparian proprietor in a grant bounded on or upon the margins of rivers or streams, whether navigable or not, took to the center thread of the stream. (*Middleton* v. *Pritchard*, 3 Scam. 510.) The rule then announced has been adhered to in this State by many adjudged cases since that time. Among others we cite *Houck* v. *Yates*, 82 Ill. 179, and *Fuller* v. *Dauphin*, 124 id. 542. The same rule is adopted in most of the States, though others hold, with reference to streams navigable in fact, the riparian owner takes only to ordinary high-water mark, and the banks between high and low-water mark and the bed of the river belong to the State. As a result of the rule adopted in this and most of the States in reference to streams, it necessarily followed that in a grant of land bordering on a river which was meandered, for the purpose of determining quantity in a fractional tract, the meander line, in and of itself, was held not to be a boundary line. *Middleton* v. *Pritchard, supra; Trustees* v. *Haven*, 5 Gilm. 548; *Houck* v. *Yates, supra; Fuller* v. *Dauphin, supra; Walker* v. *Board of Public Works*, 16 Ohio, 545; *Jones* v. *Pettibone*, 2 Wis. 308; *Marquette Boom Co.* v. *Adams*, 44 Mich. 403; *Krant* v. *Crawford*, 18 Iowa, 549; *Sherlock* v. *Bainbridge*, 41 Ind. 35; *Schurmeir* v. *St. Paul Railroad Co.* 10 Minn. 82; *Minto* v. *Delaney*, 7 Ore. 242; *Morris* v. *Benson*, 61 Mo. 345.

As thus construed, this rule gives the riparian owner accretions and islands forming within his grant, and where, by gradual accretions, the thread of the stream was slowly changed, under the application of the same rule his grant followed the channel and still went to the thread of the stream. This rule of the common law had engrafted on it this further principle: Where the course of a stream forming a boundary is suddenly changed, the relicted soil remains according to the former bounds, and a grant bordered thereon does not follow to the thread of the stream, as in the new channel. (Hargrave's

Tracts De Jure Maris; Angell on Water-courses, sec. 57; Gould on Waters, sec. 159; *Spigener* v. *Cooner*, 8 Rich. 301; *Dwinel* v. *Barnard*, 28 Me. 469; *Lynch* v. *Allen*, 4 Dev. & Bat. 62.) It resulted from this rule of the common law, that where a stream was meandered in the original survey, and conveyance made and price paid for the quantity within the meandered lines, the grant conveyed to the thread of the stream, and therefore the boundaries of the lands were not determined by the meander line. Whilst such is the rule in States adopting the rule of the common law, yet there are cases where the meandered line would be of itself the boundary, as where the line run by the government surveyors, by mistake or fraud in surveying the public lands, leaves between such line and the stream or lake a considerable body of land, on which is vegetation, etc., above the ordinary stage of water. In such case the surveyed land is all that is granted by the United States, and the patentee is not a riparian proprietor, his boundary being fixed by the meandered line.

In *Fulton* v. *Frandolig*, 63 Texas, 330, a shell reef, varying in width from twenty to sixty yards, ran from the meandered line into the bay for about a mile, and the patentee claimed this shell reef with the accretions, on the ground that the meander line should yield to the course of the bay; but it was held that, as the evidence (derived from the field notes) showed that the surveyor in fact ran across the shell reef for the course and distance, the reef was not included in the grant.

In *Granger* v. *Swart*, 1 Wol. 90, the jury were instructed as follows: "The patents and deeds under which the defendant claims do not pass the title to the premises in question, unless, at the date of the entries on which they issue, the Rock river where it is called a river, and Lake Koshkonong where it is called a lake, extended to and bordered upon the meandered line which constitutes the boundary of the lands described in the patents. In other

words, if, between the meandered line which by the government survey was made one of the boundaries of the land sold to Walker and the bank of Rock river and shore of Lake Koshkonong, there was at that time a body of swamp or waste land or flats on which timber and grass grew and horses and cattle could feed and hay be cut, then the patents of Walker did not cover this land but were confined to the actual limit of said meandered line. On the other hand, if, when the entries were made, the bank of the river and shore of the lake, at an ordinary stage of water, were where this meandered line was represented by the United States survey, and the land in controversy has since been formed by a receding of the water or by accretion to the shore and bank, then it became the land of the defendant or of Walker, as the title might be in one or the other. If the first of these positions be found by you to be true, the defendant has no title to the land; if the second be true, he has title to the addition made by the accretion."

In *Lammers* v. *Nissen*, 4 Neb. 245, in deciding the case the court says: "Another inquiry involved in the consideration of the case is as to what is the effect which a meandered line, purporting to have been run along the bank of a stream, may have in regard to land at the time lying between it and the bank of the stream, and remaining unsurveyed. And in respect to this inquiry I think it sufficient to observe, that as to public lands of the United States, conceding the rule to be well settled that a meandered line bordering on the bank of a stream is not to be considered as the boundary of the tract, but simply as defining the sinuosities of the bank of the stream and as a means of ascertaining the quantity of the land in the fraction subject to sale, yet the question whether such line does in fact define the sinuosities of the bank of the stream or not is one which may be determined by evidence *aliunde.* The mere fact that it is run and is designated upon the plats as a meandered line certainly

cannot be conclusive in the matter. To establish the doctrine that such meandered line is conclusive would estop the government from disposing of lands left unsurveyed between such line and the bank of the stream. It would prevent the correction of mistakes made by surveyors in such case, and would be in direct conflict with the well settled rule of law defining what is an accretion to land. In *Granger* v. *Swart, supra,* the principle is enunciated, that if, between the meander line by which the government survey was made, and the bank of the river, there is, at the time, a body of swamp or waste land or flats, on which timber and grass grew and horses and cattle fed, then the patents for the land surveyed would not cover this land, but must be confined to the actual limits of the. meander line and include no more." The title of defendants, acquired under a junior survey, to the lands lying between the meander line and the actual bank, was therefore held good. In that case it was represented on the plat, and the surveyor reported to the department of interior, that the meander line ran at the . west of the marsh and was along the line of the Missouri river, and the intervening 1000 acres between the real bank of the river and the meander line was navigable water. The line as made was mistakenly run, and the surveyor omitted this large tract from his survey, and it was subsequently surveyed and sold.

In *Glenn* v. *Jeffrey,* 75 Iowa, 20, a tract was situated on the east bank of the Missouri river, the facts being similar to those in *Lammers* v. *Nissen, supra,* and the trial court instructed the jury: "Under this evidence you are instructed that the plaintiff failed to show title in himself to the land claimed by the defendant. The plat and field notes introduced herein show that lot 3 was surveyed and platted and located upon the north side of certain water, which was at the time of the survey supposed to be the Missouri river. It is shown by the Adkins survey and other evidence in the case that lot 3 ran, not

to the Missouri river, but to the waters of a certain bayou, and that beyond this bayou, and between it and the Missouri river, was other land,—the land claimed by the defendant. The evidence shows that the land between this bayou and the river was not surveyed. * * * The land in controversy is lot 3 in section 18, township, etc., and the plaintiff introduced evidence showing title in himself from the government. The only controversy is whether the lot, as described, extended to the Missouri river." In commenting on that instruction it was said by the Supreme Court: "The evidence warranted the court in giving the instruction it did. There was no controversy as to the facts. It is true that the government plat and field notes described the meander line as being at the Missouri river, and therefore it is claimed that lot 3 extended to the river. In fact, however, instead of running the meander line along the river it was run along the bayou some distance from the river. The land in question cannot be regarded as accretion, but existed as it now does when the survey was made. The court rightly directed the jury to find for the defendant. The land never was, in fact, surveyed by the government and never sold or conveyed to the plaintiff."

In *Bissell* v. *Fletcher*, 19 Neb. 726, the plat and patent to plaintiff showed lot 3 to contain 52.60 acres, and to run north to the Republican river. Defendant claimed lots 6 and 7, which in fact was land between the river and where the plat showed the bank to be. The court says: "The contention of the plaintiff is that lot 3 extends to the river, and notwithstanding the fact that lot 3 contains all the land the plaintiff purchased and paid for, and the effect of the extension of the line would be to give him about 117 acres of land to which he seems to have no equitable right, still he contends the law declares the land to be his." Upon a rehearing of this case (43 N. W. Rep. 350,) the court further said: "There is no proof whatever that the land claimed by the plaintiff is

an accretion to lot 3. In fact, all of the proof tends to show that it is not. The defendant has purchased his land, as part of the public domain, from the United States, and it would be rank injustice to rob him of his property and give it to the plaintiff, who is already in possession of all of the land that he purchased and the government sold to him."

In *James* v. *Howell*, 41 Ohio St. 696, the court refused to extend a meander line across a space designated as impassable marsh and water, so as to include two islands, one containing about thirty-six and the other eighteen acres, but confined the boundary to the meander line. The computed acres in the grants did not include either the marsh, water or islands.

In *Shoemaker* v. *Hatch*, 13 Nev. 261, the court said: "To determine whether a bar or island is part of the land on either side of a stream, account must be taken, in every case, of a variety of circumstances, such as the relative size and permanence of the channels, the size of the island compared with the size of the stream, and the conformity or divergence of course between the main line and the main channel. It is a question of fact, to be determined from all the surrounding circumstances, whether the land between the meander line and the shore of the lake or water-course is included in the survey."

In *Martin* v. *Carlin*, 19 Wis. 454, there was a mistake in the original survey and meandering of Rock river, so that there was more land than the survey called for by the field notes. It was held, where there is a mistake in the government survey of a fractional lot, so that either the line of a meandered stream or a quarter section line (both of which were called for by the survey as constituting the line) must be abandoned, the quarter section line should be adhered to as the more certain call.

The decision of these cases is based on sound reasoning and on equitable rules as to property rights. To each person is given all he purchased, but not a quantity

that would be inequitable or unjust as against the government. Nor are these cases in conflict with the decisions in this State on that class of questions. In *Middleton* v. *Pritchard*, 3 Scam. 510, there was a long slough running between a small island or peninsula and the main land, in which the river (Mississippi) flowed two or three months in the year. The meander line ran along this slough on the main land twenty or twenty-five feet up from the channel of the slough in high water, the eastern boundary of this slough forming, therefore, the eastern boundary of the river, and the boundary was carried beyond the meander line to this bank of the river. The owner's land thus bordering on the river and going to the center thereof, he was entitled to the island in controversy. In *Canal Trustees* v. *Haven*, 5 Gilm. 548, the divergence between the meander line and the river line is not disclosed. In *Houck* v. *Yates*, 82 Ill. 179, the strip of land between the meander line and the natural boundary (Mississippi river) varied in width from one-half of a rod to three rods, and contained in all four or five acres. In *Fuller* v. *Dauphin*, 124 Ill. 542, the land in controversy was an island in the Mississippi river of five acres, which was held to pass under a patent of about twenty-three acres on the main land. In this case there does not appear to have been any divergence between the meander line and the natural boundary of the Mississippi river.

*Railroad Co.* v. *Schurmur*, 7 Wall. 272, is in its facts similar to *Middleton* v. *Pritchard, supra.* The main body of the land contained 9.28 acres. The parcel in dispute was 2.78 acres. The latter was a narrow strip of low land, constituting a bar or island, about 90 feet wide in its extreme width and 160 feet long, extending along the meander line.

From these cases it would follow the construction of the grant would be: where a narrow strip of land lies between the meander line and the natural boundary, as a stream or river, and its proportions are much smaller

than the land granted, it would be included in the grant and the center of the stream or river would be the boundary, unless a different intention was manifested by the terms used. Where the land outside the meander line is so grossly in excess of that sold that it is apparent there is fraud or mistake in the survey, the meander line would be the boundary. In *Mitchell* v. *Smale,* 140 U. S. 406, it was said: "We do not mean to say that in running a pretended meander line the surveyor may not make a plain and obvious mistake or be guilty of a palpable fraud, in which case the government would have the right to recall the survey and have it corrected by the courts or in some other way. Cases have happened in which, by mistake, the meander line described by the surveyor in the field notes of his survey did not approach the water line intended to be portrayed. Such mistakes, of course, do not bind the government. Nor do we mean to say that in granting land bordering on a non-navigable lake or stream the authorities might not formerly, by express words, have limited the granted premises to the water's edge and reserved the right to survey and grant out the lake or river bottom to other parties. But since the grant to the respective States of all swamp and overflowed lands therein this cannot be done."

From these cases it will be seen, if there is such a mistake by the omission of lands in a survey between the meander line and the water that the proportion to that sold is great, it may be corrected by a re-survey. In the case here before the court the field notes show the running of the meander line was across the ridge and at both the south and north sides of the lake. There was not such an omission of land from the survey that it is apparent a mistake was made, nor is there in the survey any evidence of fraud in the manner in which it was done. Whether a riparian proprietor on a lake takes the bed of the lake is a question on which the decisions of the different States are conflicting. Whilst the riparian pro-

prietor takes to the center of a stream, the stream will still exist notwithstanding changes by accretions, etc. The same reason for the rule does not exist where land borders on a lake, as by recession of the water the bed of the lake may become dry land and the lake cease to exist. The grant of land on a lake would, on the instant of the grant, be a conveyance to the center of the lake, if the same rule existed as with reference to rivers. The determination of boundary lines to the center of the river is not attendant with any serious difficulty, but the irregular borders of a lake would render the determination of lines in the bed of the lake between riparian proprietors of almost impossible solution. This, as well as the injustice of holding that the purchaser of a small rim of the lake, consisting of but a few acres, would at once become the owner of thousands of acres of a non-navigable lake, has caused many courts to hold the riparian proprietor takes only to the water's edge. As declaring this rule we cite the following cases among others:

In *State* v. *Gillmanton*, 9 N. H. 461, the question involved being the boundary of the town, it was said: "The rule for the construction of grants bounding on rivers is,   *   *   * where a grant is made extending to a river, and bounding upon it, the center of the stream is the line of the boundary, if there are no limitations in the grant itself. But in relation to grants on ponds, lakes or other bodies of standing fresh water that principle does not apply, but the grant extends only to the water's edge."

In *Marriner* v. *Schultz*, 13 Wis. 692, the court approved the instruction of the inferior court, which directed that in a grant of land bordering upon a pond the title did not extend beyond the natural shore.

In *Diedrich* v. *N. W. U. R. Ry. Co.* 42 Wis. 248, the court say: "The rule that the title of the riparian owner upon a natural lake or pond does not extend beyond the natural shore, appears to be very generally, almost universally, recognized, and is discussed by COLE, C. J., in

*Deleplaine* v. *Railway Co. supra.* It is unnecessary to repeat here what is there said, and in which we all concur. Indeed, the position was affirmed in this court as far back as *Marriner* v. *Schultz,* 13 Wis. 692."

In *Fletcher* v. *Phelps,* 28 Vt. 257, the court, on the question of boundary, said: "Where land is sold and bounded on the river or stream of water above tide-water, the grant extends to the middle of the channel or thread of the stream. That is the legal effect of the conveyance, and cannot be varied or controlled by parol testimony. * * * A different rule prevails where land is conveyed bounded on large natural ponds or lakes. In such case the grant extends to the water's edge, or if the * * * lake or pond has a definite low-water mark, the grant will extend to low-water mark."

In the case of *Bradley* v. *Rice,* 13 Me. 201, the court say: "It is true that where land is bounded on the river or stream where the tide does not ebb and flow, the owner's title, by construction of law, extends to the center or thread of the stream. But Flying pond is not a river or stream. No case has been cited, nor have we found any, where that case of construction has been extended to a pond or lake. Had the land been bounded upon a river or stream, or artificial pond created by expanding a stream by means of a dam, the riparian proprietor would go to the thread of the stream. This is law well settled and understood. But it has not been so settled in regard to ponds and lakes, nor are we aware that there can be one construction for small ponds and lakes and another for large ones." The same principle is recognized in *Robinson* v. *White,* 42 Me. 209, *Nelson* v. *Butterfield,* 21 id. 220, *Wood* v. *Kelley,* 30 id. 471, and *Mansur* v. *Blake,* 62 id. 38.

In *Kanouse* v. *Slockbower,* 48 N. J. Eq. 42, the court was called upon to decide whether a devise of land bounded by a margin of the lake carried the devise to the center of the lake or whether the lake bed passed to the residuary devisees, and the court said: "The law is well settled

that a grant of land bounded upon or along a river, above tide-water, carries the title of the grantee to the center of the stream, if the title of the grantor extends that far, unless the terms of the grant show that it was the intention of the parties that the grantee's title should not extend to that point. But this doctrine has not * * * been held to apply to grants of land abutting upon fresh-water lakes and ponds."

Angell on Water-courses (sec. 41) says: "When land is conveyed bounding upon a lake or pond, if it is a natural pond, the grant extends only to the water's edge."

In *State of Indiana* v. *Milk*, 11 Fed. Rep. 389, Judge GRESHAM said, "that while a general grant of land on the river or stream non-navigable extends the line of the grantee to the middle or thread of the current, the grant on a natural pond extends only to the water's edge," and thus stated the difficulties of the contrary rule: "Non-navigable streams are usually narrow, and the lines of riparian owners can be extended into them at right angles, without interference or confusion and without serious injustice to any one. It was therefore natural, when such streams were called for as boundaries, to hold that the real line between opposite shore owners was the thread of the current. The rights of the riparian proprietors in the bed of the stream, and in the stream itself, were thus clearly defined. But when this rule is attempted to be applied to lakes and ponds practical difficulties are encountered. They have no current, and, being more or less circular, it would hardly be possible to run the boundary lines beyond the water's edge so as to define the rights of shore owners in the beds. Beaver lake is seven and a half miles east and west and less than five miles north and south. Extending the side and end lines into the lake, there being no current, when would they meet? This rule is applicable, if at all, whether there be one or more riparian proprietors. * * * It would be unfair and unjust to allow a party

to claim and hold against his grantor the bed of a lake containing thousands of acres, solely on the ground that he had bought and paid for the small surrounding fractional tracts—the mere rim."

In *Clute* v. *Fisher*, 65 Mich. 48, the court held that the grantee of land bordering upon a non-navigable lake did not stop at the water's edge, but that he might take so much of the bed of the lake as was required to fill out the section or quarter section of which he owned a fraction, and that his common law right was limited by the sectional lines of his survey. In that case such extension of lines absorbed the entire lake, but the court does not clearly indicate what should be done if the body of water was so large that the lines of the granted section or quarter section would not embrace the whole lake bottom.

In *Stoner* v. *Rice*, 121 Ind. 51, the court held the grant not limited by the water's edge, and the *Clute case* is followed, with the result of absorbing all the lake bed by the extension of sectional lines. The court said: "It is contended that the riparian owner bordering on a non-navigable. lake, like a river, takes to the thread or center of the lake. This rule is impracticable when applied to lakes. Suppose the lake to be round, or nearly so, with riparian owners, as there would be, on the north, south, east and west of it, this rule could not be applied. * * * Where the body of water is a running stream, being a narrow rivulet at its head and growing larger and widening until it enters into another stream still larger, or where it is a long, narrow body of water, there is no trouble in applying this doctrine; but where the body of water is surrounded by land, and is almost circular in form, covering a quarter or half section or more of land, with riparian owners on either side, we cannot say that the owners on the east and the west could take to the exclusion of those upon the north and south, nor *vice versa.* Nor would it do, as it seems to us, to apply a

doctrine that would require the running of diagonal lines between the various owners, each reaching to the center of the lake." The court also said that the section lines could not be passed when the lake is so large that the extension of those lines would not absorb it. To the same effect are *Hodges* v. *Williams,* 95 N. C. 331; *Waterman* v. *Johnson,* 13 Pick. 261; *State* v. *Portsmouth Bank,* 106 Ind. 435; *West Roxbury* v. *Stoddard,* 7 Allen, 158; *Noyes* v. *Collins,* 26 L. R. A. (Iowa,) 609. Many other cases could be cited.

The question was before this court in reference to a grant of land bounded on Lake Michigan, in *Seaman* v. *Smith,* 24 Ill. 521, in which it was said (p. 525): "These great bodies of water having no currents like rivers and other running streams, cannot present the same reasons why the boundary should be extended beyond the water's edge, where it is ordinarily found, that apply to running bodies of water. Where such streams are called for as a boundary, the thread of the current is held to be the line from each side. Such a rule could not, for the want of a current, be adopted in this case. It would not be sanctioned either by analogy to the rule or by reason; and if the outer edge of the water be passed, owing to the approximation of these bodies to a circular shape, it would be found exceedingly difficult, if not impossible, to ascertain where the boundary should be fixed or the shape it should assume."

In *Trustees of Schools* v. *Schroll,* 120 Ill. 509, it was said (p. 518): "It is equally well settled that grants of land bounded on streams or rivers above tide-water carry the exclusive right and title of the grantee to the center of the stream, *usque ad filem aquæ,* subject to the easement of navigation in streams navigable in fact, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the stream. * * * But an entirely different rule applies when land is conveyed bounded along or upon a natural lake or pond. In such case the grant extends only to the water's edge."

These principles, as enumerated in the two cases cited in this State, are based on the principles of the common law, as we understand it and as it has been held by courts of various States.

It is urged, however, that the decisions of the New England States are based on colonial ordinances of 1641 and 1647. The Massachusetts colony, by an ordinance of 1641, provided that great ponds containing more than ten acres of land should be free for fishing and fowling, and by the amendment thereto of 1646 towns were prohibited from granting away great ponds. All the New England States whose opinions hold as we do, were not, however, subject to the ordinances of the Massachusetts Bay colony.

The principle that the riparian owner takes to the center of the bed of a non-navigable lake is sustained in *Lembeck* v. *Nye*, 47 Ohio St. 336, *Smith* v. *City of Rochester*, 92 N. Y. 463, *Warren* v. *Chambers*, 25 Ark. 120, and *Longway* v. *State*, 18 L. R. A. (Minn.) 670. Many other cases might be cited sustaining the same view. The same rule is held by the Supreme Court of the United States in *Hardin* v. *Jordan*, 140 U. S. 371.

From the fact that so few lakes existed in Great Britain no question of the right of the riparian proprietor to the bed of the lake was there claimed to be presented until 1878, when the case of *Bristow* v. *Cormican*, 3 App. Cas. 641, relating to Lough Neagh, in the north of Ireland, was before the House of Lords. There the plaintiff sued the defendant in trespass for fishing in the lake, and deraigned title from the crown, by a grant in the time of Charles II, of all fishing in that body of water. It was held the crown had no right to make such grant in such waters, as against the rights of riparian owners or others. This decision of the high authority from which it originates is deserving of the greatest consideration. It is not of that controlling authority as to what is the common law which it would have been if made before the

organization of our government. Nor do we believe this decision can be said to determine riparian rights as taking the bed of the lake. The large fresh water lakes in and bordering this State present conditions wholly unprovided for by the common law of England, and the law of boundary as applied to rivers is inapplicable to such lakes. A principle applied to a large lake is a principle applicable to a smaller one. This principle applies to such as are meandered in the original survey. Where, however, such small lakes are not meandered, but are of a size that they are included within the corners of a survey, then a different condition exists, and they would be included in a grant of the land.

In the case of *Beckman* v. *Kreamer*, 43 Ill. 447, a small lake existed, and the riparian proprietor owned on both sides. A trespasser entered on the lake and seined for fish, disregarding the objections of the riparian owner. The riparian proprietor brought an action of trespass, and it was held he could recover. Whether the lake was meandered in the original survey or included within the corners of a subdivision is not shown. Neither does it appear whether it was a lake proper, or a mere widening of a stream with a current therein. If the latter, or a lake not meandered and included within the corners of a survey, then the riparian proprietor took its bed.

These cases cited are the only decisions with reference to boundary or riparian ownership of lakes which have heretofore been before this court, and there is no conflict therein, and no reason exists why we should change the rule therein announced. On the contrary, aside from the principle of *stare decisis*, we should adhere to that rule. The policy of the State in recent years has been to stock its waters, both streams and lakes, with fish, as a means of giving cheap and valuable food to her citizens, and with this purpose regular appropriations and expenditures are made. If we depart from the reasonable rule we have established, the small non-navigable lakes would

become the private waters of riparian owners, pertinent to their lands, with exclusive rights thereon as to boating, fishing and the like, from which the body of the people would be excluded,—a principle inconsistent with and not suited to the condition of our people or called for as a rule of law.

The Supreme Court of the United States, by a divided court, in *Hardin* v. *Jordan, supra,* and *Mitchell* v. *Smale, supra,* has sought to apply the same rule to lakes as to streams, and follows *Bristow* v. *Cormican, supra,* as announcing such to be the common law rule, and declined to recognize *Trustees of Schools* v. *Schroll, supra,* as the law of Illinois. We yet, notwithstanding the high respect we owe that august tribunal, hold the common law to be as we have heretofore announced it,—a view taken in the opinion of the dissenting minority in those two cases and with which the views of many able courts in different States concur.

It now becomes necessary to determine whether the lake bed passed to the State under the Swamp Land act. Prior to 1850 there were many lakes similar to those in this record referred to, in many of the States, which induced the passage of the Swamp Land act, with the amendments. The decisions of the various State courts on the construction of that act have not been accordant. In the Supreme Court of the United States, in *Railroad Co.* v. *Smith,* 9 Wall. 95, it was held the right of the State to swamp and overflowed lands did not depend on the action of the Secretary of the Interior in making lists of them, and oral evidence in a court of justice showing lands to be swamp lands could be received, which would exclude them from passing under a grant from which they were excepted. In *French* v. *Fyan,* 93 U. S. 169, it was held by the second section of that act the power and duty devolved upon the Secretary of the Interior, as the head of the department which administered the affairs of the public lands, of determining what lands were of

the description granted by the act, and made his office the tribunal whose decision was to control that question. In *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, parol evidence was held inadmissible to show certain land patented under that act was not swamp land. In *Martin* v. *Marks*, 97 U. S. 345, it was held it would probably have been necessary, to support a title under that act, to prove the list was on file with the commissioner. The great weight of authority is, the grant made by that act operated *in præsenti*. From a consideration of the opinions of that court it appears, that whilst the act operated as a grant *in præsenti*, it was a question for the decision of the Secretary of the Interior whether a particular tract was swamp land, and his decision, when once made, was final and conclusive, and it is sufficient if lands have been selected as within the act, and when so selected the title relates to the passage of the act. If the secretary has not designated any tract as swamp lands within a State, and neglects and refuses to act, and has not decided to the contrary, then it may be shown by parol, in behalf of the State or one claiming thereunder, as against wrongful claimants, that a particular tract is of the character included within the act. There are no means by which the Secretary of the Interior may be compelled to act. *French* v. *Fyan, supra*; *Gaines* v. *Thompson*, 7 Wall. 347; *Secretary* v. *McGarrahan*, 9 id. 298; *Litchfield* v. *Register and Receiver*, 9 id. 575.

After the survey of 1874 the record shows that at a hearing held under the supervision of the general land office of the department of the interior about the time of the survey of 1874, the State of Illinois and the county of Cook (the swamp lands in Illinois having been conveyed by the State to the counties by act of June 22, 1852,) claimed these lands in controversy as swamp lands, but this claim was rejected and the survey of 1874 approved, upon appeal to the Secretary of the Interior. Since that determination of the question these lands so

surveyed have been taxed for State and county purposes. It appears from the evidence the hearing by the officers of the land department was had on questions of fact.' The determinations of these officers are conclusive on the parties to such proceeding except in a direct proceeding. (*Johnson* v. *Towsley*, 13 Wall. 72; *Warren* v. *Van Brant*, 19 id. 746; *Shepley* v. *Cowan*, 91 U. S. 230; *Marquez* v. *Frisbie*, 101 id. 473; *Quinby* v. *Conlon*, 104 id. 420; *Smith* v. *Smelting Co.* 106 id. 447; *Cragen* v. *Powell*, 128 id. 691.) In the latter case it was also held, when a survey had been made and approved by the government, with plats, maps, field notes and certificates filed, and such lands so surveyed are sold, the courts have power to protect the private rights of a party who has purchased in good faith from the government, against the interferences or appropriations of subsequent corrective re-surveys made by the land office. To the same effect is *More* v. *Robbins*, 96 U. S. 530. ·

From these cases it would follow the county of Cook has no claim on the lands to be in any manner determined in this case, it not being a party, and not having sought, by a direct proceeding, to determine the correctness of that ruling, and no lists made by the secretary of the land as swamp lands. The question, therefore, as to private rights must be determined by settling the rights of the parties under the patents issued on the two surveys.

The evidence shows the survey of 1874 was made, in the greater part, as a survey of land covered with water, but slight changes existing then from what existed at the time of the original survey. By that survey an attempt was made to take possession of and survey and sell riparian rights in land where no claim was made of fraud or mistake in the original survey of 1834 and 1835. No such right existed in the commissioner of the general land office. Riparian proprietorship is a property right of value, and to it are attached rights and privileges conferred by law, of which the owner cannot be deprived

by an illegal proceeding. In this case such rights must be resolved by the law of Illinois as to land bounded on a meandered lake. In *Trustees of Schools* v. *Schroll*, and *Seaman* v. *Smith*, *supra*, we held the riparian owner took to the water's edge. It was a determination of a question of property rights. We applied the same principle to lakes so meandered, regardless of the question whether or not they were navigable. *Seaman* v. *Smith* is in line with the uniform current of decisions as to navigable lakes. The *Schroll case*, as we have seen, is abundantly sustained by authority. We are asked to overrule the latter case and hold the grant to the riparian owner conveys the bed of a non-navigable lake and makes its waters mere private waters. We decline to do so. By such holding, so long as such meandered lakes exist, over their waters, and bed when covered with water, the State exercises control, and holds the same in trust for all the people, who alike have benefit thereof in fishing, boating, and the like.

By the adoption of this principle, which applies alike to all meandered lakes, streams and rivers, there is no conflict with that applying to the sea, and littoral proprietors and riparian owners alike have all the benefits and rights of such ownership and take accretions to their lands. (*Chicago Dock and Canal Co.* v. *Kinzie*, 93 Ill. 415.) Whether we apply the term "accretion" to the slow, gradual, imperceptible formation of land on streams or lakes by the action of the current of the one or the recession of the waters or waves of the other, it is pertinent to the land alike and an accretion thereto. This doctrine of accretion has not, however, been applied to reliction, using the term in its best and strictest sense, for in such case the new land, if considerable and suddenly or perceptibly formed, in the case of lakes or the sea and tidal streams, belongs to the State; and in the case of streams or rivers, as we have already stated, the center of the old channel remains the boundary between the riparian

owners. The survey of 1874 was unauthorized, and no title by patents issued thereunder conveyed the bed of the lake. Neither did the grant of the fractional tracts, as made under the survey of 1834 and 1835, convey the bed of the lake, but gave riparian rights. Where accretions come to such riparian proprietors they shall take to the water's edge, and follow the recession of waters to their edge. Their lines and bounds are thus determined and are certain. This rule recognizes the riparian proprietor's rights to the fullest extent. The value of his riparian rights are preserved to him. If, as in many such lakes, there is much depth of water on one side and very shallow on the other, and in process of time recession of waters on the shallow side passes beyond the lake's center, the owner on that side still goes to the water's edge, and the proprietor on the other side should not come in between the lake and such proprietor after the waters have receded beyond the center. Where there is depth of water the lake still exists, and one proprietor is not deprived of the benefit of his riparian rights.

It is urged with much vigor that the question of the effect of patents to lands issued by the United States is peculiarly within the province of her courts for construction. It is of a higher importance that the law of this State shall, so far as it is local to the State and its citizens, and to its and their interests, be determined and controlled by the courts of the State. When the law of Illinois shall be declared and recognized, when it is within the province of her courts to determine it, a recognition of it would enable this State to control such bodies of water within her borders for the benefit of the people and preserve to the riparian proprietors their rights as such owners.

On the question of limitation, sought to be asserted under color of title, we will not attempt to analyze and discuss the mass of conflicting evidence appearing in this record. We concur with the learned chancellor in the

view taken by him of actual possession.   In no case was it of that character that complied with the requirements of the law.   There was such interruption of the running of the statute that no title became settled.   In many of the tax deeds set up in the cross-petitions the defects in notice, absence of judgment and precepts, etc., caused no title to be conveyed.   The rights acquired by the South Chicago and Southern Railroad Company being from those claiming under the survey of 1874 must fail with those claiming thereunder.

J. Ensign Fuller seeks to set up tax title by four tax deeds: (a) One of these deeds is said to have been to D. G. Hamilton, September 6, 1875, under sale April 6, 1873, of the west half of the north-west quarter of the south-east quarter of section 19.   (b) The next tax deed so set up is also said to have been to Hamilton, dated March 5, 1877, of the undivided twenty acres in the north-east quarter of the south-east quarter of section 19.   (c) The third tax deed set up by Fuller is one of May 31, 1877, to P. D. Hamilton, which again is for the west half of the north-west quarter of the south-east quarter of section 19.   (d) The fourth tax deed set up by said Fuller in his answer is one of July 23, 1880, to Hamilton, of the north-east quarter of the south-east quarter of section 19. Nothing is offered to support deeds a and c—neither judgment nor precept.   Deed b was for special assessment of the South Park Commissioners, and neither a judgment nor notice to owners is shown.   Deed d was based on a notice of application for a deed describing the lands in section 9 instead of 19.   The cross-bill of Fuller also avers ownership of lots 2 and 3 of the south-east quarter of section 19, and the south-east fractional quarter of the east fraction of the south-west fractional quarter of the section.   The last three tracts, as well as some of those to which it is sought to assert tax title, are described under the survey of 1874.   The answer of F. F. and John I. Bennett, filed September 12, 1889, as-

serts a claim, one-half by John I. Bennett and one-fourth by Fred F. Bennett, to fractional north-east quarter of section 30, by virtue of a sale for the fourth installment of South Park assessment to R. W. Bridge, such sale having been made November 9, 1876.

The insufficiency of the tax deed first given under this sale results because it bears date August 1, 1879, and recites the sale was made on November 9, 1879, and the answer shows an attempt by the county clerk to give a new deed, dated March 8, 1882, recorded March 13, 1882. This attempt to correct the error in the first deed would be ineffective. The sale became void under section 225, chapter 120, of the Revised Statutes, because a proper deed was not taken out within one year after the time for redemption expired. (*Chappell* v. *Spire,* 106 Ill. 472; *Altes* v. *Hinckler,* 36 id. 265; Burnt Records act, sec. 23.) In addition to this, the description of land sold and as assessed is indefinite and uncertain. The claim of tax title as to fractional section 29, 7.37 acres, under tax deed issued to R. W. Bridge, dated August, 1877, No. 335, based on sale of December 3, 1874, for the second installment South Park assessment, and as to south-west fractional half section 20, 4.53 acres, under tax deed dated August 1, 1879, No. K 568, running to the South Park Commissioners, based on a sale of November 9, 1876, for the fourth installment South Park assessment, cannot be sustained, as the judgments on which the sales were based and deeds issued included excessive costs. *Combs* v. *Goff,* 127 Ill. 431.

The tax titles sought to be set up in the various cross-petitions not being valid, it was not error to dismiss all the cross-petitions on that question. Neither was there continuous and exclusive possession under such deeds as color of title. The answers putting in issue the right of Shedd and Hardin to the bed of the lake, it follows the decree of the circuit court finding they, by *mesne* conveyances, became the owners of the lake bed, was erroneous.

The decree is in part affirmed and in part reversed, and the cause remanded for further proceedings in conformity with this opinion. Appellants Charles E. Rand, Franklin A. Cleaveland, Elizabeth Thomas, and the South Chicago and Southern Railroad Company are each ordered to pay one-eighteenth of the costs of this court. Appellants J. Ensign Fuller, Conrad N. Jordan, John I. Bennett and Frank I. Bennett are jointly ordered to pay two-ninths of the costs of this court. Charles B. Shedd and Gertrude H. Hardin are each ordered to pay five-eighteenths of the costs of this court.

*In part reversed.*