# HARRIET SAWYER

*v.*

# JESSE S. COX.

1. TITLE—*Illinois Central Railroad lands.* The act of Congress granting lands to the State of Illinois, donating lands in aid of the construction of the Central Railroad, and the certified schedules issued by the Secretary of the Interior and the Commissioner of the General Land Office, are evidence of title in the State.

2. LOST *conveyance—parol proof.* When it is shown that, under the act of February 19, 1851, the Governor of the State had executed a deed of the donated lands to the railroad company, which, owing to its great length, had not been recorded, and was burned, parol proof of its contents is admissible.

3. CORPORATION *deed—who may execute.* A deed in which a corporation is declared, in the body of it, to be the grantor, and signed by "John Newell, V. President," attested by the seal of the corporation, is *prima facie* well executed, and is the deed of the corporation.

4. ACKNOWLEDGMENT. An officer of a corporation whose duty it is to countersign and register its deeds, is not thereby disqualified from taking acknowledgment thereof, as a notary—his signature not being necessary to the validity of the instrument.

5. GOVERNMENT SURVEYS—*of paramount authority.* The purchaser of government lands acquires, by his patent, title to all of the land embraced within the boundary lines of the tract purchased, even though the survey be inaccurate, for the boundaries, when found, must control the notes and plat of the survey. The plats and notes of the survey are intended to represent what was done in the field, and must yield to the lines and courses when found. But when the monuments designating the boundaries are obliterated and can not be found, they can only be relocated by the field notes and plats of the original survey. In doing this, resort must be had to other known lines and monuments as a basis of survey. Unless this be done, a party in possession under an assumed survey, and with the consent, can not be disturbed. Parties having no title to land, nor holding an equitable title, can not encumber the title, nor bind parties in law, so as to prevent the enforcement of legal rights when acquired, especially strangers to the transaction.

6. PRACTICE—*as to irregular assignments.* After an assignee of a land contract has received the deed for which it provides, inquiry can not be made, in a suit in ejectment, whether the form of assignment was in all respects regular.

APPEAL from the Circuit Court of Coles county; the Hon. JAMES STEELE, Judge, presiding.

This was an action of ejectment, brought by Jesse S. Cox against Harriet Sawyer, to recover the northwest quarter of section 6, township 12 north, range 8 east of the third principal meridian, in Coles county. Trial was had by the court, resulting in judgment in favor of Cox for 20 acres off the south side of the tract.

The tract in dispute was comprised in the grant made by the act of Congress September 25, 1850, to the State of Illinois, in aid of the construction of the Illinois Central Railroad. The lands passed from the State to that company under its act of incorporation passed February 19, 1851, and the deed made by the Governor to the company in compliance with that act, the date of the deed being the same as that of the law requiring it.

It may be stated, as matter of history, that the granted lands had been conveyed by the company in trust to John Moore, Morris Ketchum and Samuel D. Lockwood, and re-conveyed by them to the company; and that sale of this particular tract had once been made to Thomas Jaques and others by contract, which was subsequently canceled.

On the first of April, 1862, the whole of the section was sold in forty-acre contracts to M. A. Lawrence, John Shanklin, and Harriet Sawyer. This sale was evidenced by duplicate contracts, all of which were destroyed by the fire of October, 1871, having been surrendered for cancellation on the issuance of deeds, on payments being completed for the various tracts. It was shown that they took possession under these contracts, and afterwards sold by assignment of contracts 480 acres, including the northwest quarter, to Henry O'Byrne, who took possession under his assignments, and held until the time of his death; after which the administrator of O'Byrne sold to Cox, the appellee, the northwest quarter, assigning to him the contracts therefor. Cox, having made full payment to the

railroad company, received a deed for the northwest quarter in the usual form of deeds, which bore the following attestation :

" In witness of which the grantor has set its seal and caused these presents to be signed by its Vice President, and countersigned by the Land Commissioner and Secretary of the Land Department, this twenty-fifth day of January, A. D. 1871.

[SEAL.]                    JOHN NEWELL, *Vice Pres't.*
J. B. CALHOUN, *Land Commissioner.*
P. DAGGY, *Secretary."*

The acknowledgment was made by "The Illinois Central Railroad Company, by John Newell, its Vice President," before Peter Daggy, a notary public, in the usual form.

The controversy arises in this way : The section is fractional, not an even 640 acres. The lines of survey had disappeared. When Lawrence, Shanklin and Sawyer sold to O'Byrne, they assigned the railroad contracts for the northwest quarter without reservation. Before the sale to O'Byrne a survey was made, he being present, and an arbitrary line run between what was supposed to be the northwest quarter and the southwest quarter, on which stakes were set. It did not then appear, nor did it satisfactorily appear on the trial below, that this line was upon the government survey. It was proved to have been agreed that O'Byrne was to take all of the section north of that arbitrary line, (although the assignment to him of the railroad contract was without reservation,) and sufficient to make up 480 acres, to be taken from the east end of the south half of the section ; that he actually took the north half, 354.87 acres, and from the east side of the south half 125.13 acres.

It was shown by stipulation that the appellant, Harriet Sawyer, held, by title from the railroad company, the southwest quarter, and had occupied and cultivated up to the arbitrary line referred to, down to the commencement of the suit,

and that appellee, Cox, had occupied and cultivated down to the same line. The object of the suit, on the part of Cox, was to show that the true line of government survey was twenty rods south of the arbitrary line, and that under his assignment from O'Byrne, and his deed from the railroad company, he was entitled to have the disputed strip of twenty rods in width. The numerous objections raised to the competency of testimony are fully stated in the opinion.

Messrs. HENRY & READ, for the appellant.

Messrs. PARKER & McINTYRE, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of ejectment, brought by appellee, in the circuit court of Coles county, against appellant, to recover a tract of land. The declaration contains three counts: the first claims the full quarter section, being the northwest quarter of section 6, township 12 north, range 8 east of the third principal meridian; the second, a strip described by metes and bounds on the same quarter; and the third, a strip twenty rods in width on the south side of the quarter.

The case was tried by the court by consent, without a jury, when the court found for the plaintiff below on the third count, and rendered judgment in his favor for the strip twenty rods in width on the south side of the quarter; from which defendant has prosecuted this appeal, and asks a reversal.

It is first objected that the appellee failed to show title in himself by a regular chain from the general government. The first proof offered was the act of Congress appropriating lands for the construction of a railroad from Chicago to Mobile, by which the title became vested in the State upon a selection being made. Certificates of the Secretary of the Interior and the Commissioner of the General Land Office, that certain lands had been selected by the State of Illinois under the act

setting apart lands for building the road, which embraces the quarter in controversy, were also read in evidence. This act and these certificates proved the title in the State.

An act of the general assembly (February 19, 1851,) was read, which authorized the Governor to deed the land thus donated and selected to the Illinois Central Railroad Company. It was proved by Peter Daggy that the Governor executed the deed; that it included this quarter section; that owing to its great length it had never been recorded, and had been destroyed by the recent conflagration in Chicago, together with other papers and books of the company.

This evidence, we think, sufficiently proves the execution and contents of the deed and its destruction, to render the parol evidence admissible to establish the conveyance; and unrebutted and unimpaired in its force by cross-examination or otherwise, we are of the opinion that it sufficiently proves the conveyance to the company.

A deed for the premises from the railroad company to appellee was read in evidence against the objection of appellant.

It is first urged that the execution of the deed is defective, because it is not signed by the company. It is signed by the vice-president, with the seal of the company attached, and attested by the Secretary.

In the case of *Phillips* v. *Coffee*, 17 Ill. 154, it was said that the execution of the deed by the president of the bank, with the seal annexed, afforded *prima facie* evidence that it was the seal of the bank, and the instrument was held to be valid. In that case the deed was signed by the president of, and not in the name of the bank. The president, being the head of these corporations aggregate, unless prohibited by charter or restricted by their by-laws, acts for the body, and through him they execute their contracts and agreements; and when his name appears to an instrument purporting to bind the company, the law will presume it is executed by sufficient authority from the body.

All persons know that the vice-president of such bodies acts and is authorized to act in the place of the president in case of his absence, inability to perform the duties of his office, or when it is vacant. This is the daily custom, and is never challenged. A large amount of the business of these bodies of much importance is thus transacted, and we are aware of no adjudged case where the validity of such acts has been questioned. Why have a vice-president, if he may not, when occasion requires, act instead of the president? If not, what are his duties? Why create such an office, unless he may so act as the name of his office implies? We are at a loss to perceive even a plausible reason for this objection.

It is also urged that the seal attached to the deed was not proved to have been that of the company.

The same objection was raised in the case of *Phillips* v. *Coffee, supra,* and was held to be without validity. There would be the same reason for requiring an individual to prove the seal he had attached to a deed was his, as to require proof when the seal of a corporation is attached; and yet no one has, so far as we are aware, ever thought of requiring such proof. But the question is settled by the case of *Phillips* v. *Coffee, supra,* and we can not perceive the slightest reason for in anywise modifying the conclusion there announced.

It is objected that the deed from the railroad company to appellee was not properly acknowledged. We see no objection to the vice president appearing for the company and acknowledging the deed. Appellant's counsel has not suggested, nor can we perceive how the company could have otherwise acknowledged the deed; nor do we see any force in the objection that Daggy took the acknowledgment and made the certificate. He at most but attested the execution of the deed, and, like any other witness, could take the acknowledgment, if an officer authorized by law. We have no evidence that the by-laws of the company required it to be attested by him as one of the steps necessary to the validity of the deed.

Having established title to the entire quarter of land, the question then presents itself, whether appellee proved the boundary between it and the southwest quarter at the place he claims it was located by the general government. And to recover the strip for which he obtained judgment, he was bound to prove that the line previously recognized and run by a surveyor, and to which appellant claimed and had possession, was erroneous, and the line to which he claimed and recovered is the true boundary between the two quarters.

The evidence of the various surveys of these lines is meagre, indefinite and unsatisfactory in its character. No plat or field notes of any of the surveys are given in the record; nor is there any evidence from which it may be seen how the surveyors arrived at their conclusions when the lines were located. They do not seem to have started at known and recognized true interior section corners in the township, or that there was not to be found all or a portion of the original corners to section 6. For aught we can see, the lines may have been arbitrarily run, without reference to original corners or lines. When the survey was commenced on the township lines four miles east and six miles north, there is nothing to show that any evidence was found of the position of any other corners established by the government on these lines. It does not appear whether a single government corner was found for mile and half mile distances along either line, or that the northwest corner of the township was found, or if not, how it was established.

The object of these surveys is, first, if practicable, to find the original corners established by the surveys made by the authority of the government. It is by those lines and corners the government sold and persons purchased the public lands. And when sold, the purchaser, by his patent, acquired title to all of the land embraced within the boundary lines of. the tract thus purchased. When the lines and corners established can be found and identified, the purchaser acquires title to all the lands embraced within their limits. And it does

not matter whether the surveys are accurate, as the boundaries when found must control the notes or plat of the survey. Hence they govern the calls for course, distance and quantity. The plats and notes of the survey are intended to represent what was done in the field, and must yield to the lines and corners when found. But when they have become obliterated and can not be found and traced by natural or artificial monuments, they can only be re-located by the field notes and plats of the original survey. And in doing so, then resort must be had to known lines and monuments as the basis on which to survey and find where the original lines and corners were established by the government surveyors. One of the modes by which such lost lines and corners may be restored is fully discussed in the case of *McClintock* v. *Rogers*, 11 Ill. 279, and perhaps indicates one of the most satisfactory means of restoring lost corners.

It then appearing that, at some former period, a survey was made and the line located between the northwest and southwest quarters of section 6, to which appellant occupies and cultivates, and which he claims to own, and appellee having failed to show that this line is incorrect, he should not recover. The previous line seems to have been claimed, if not regarded, as correct, and it must be shown to be incorrect before a recovery can be had.

It is true that a witness was called who stated the county surveyor ran the line at a different place, but the minutes of his survey, with a certificate that he had established the line at that place, are not shown. Nor does the evidence show that he placed monuments indicating the establishment of the line between the two quarters. Nor does he testify in the case, but his line is sought to be established by witnesses who were present, but, so far as we can see, took no part in the survey. But even if they knew that it was established as a line, no notice was given to appellant that the survey would be made, and hence she is not bound by it, and not having notice, the

survey must be shown to be correct. In such a case no presumptions can be indulged in its favor.

It is claimed that the first line run was by agreement between parties holding contracts for the purchase of the different portions of this section, and that appellee, having received an assignment of a portion of those contracts, and paid the balance of the purchase money and obtained his deed thereunder, is estopped now to dispute the correctness of that line. The parties to this agreement had no title to the land, not even holding at the time an equitable title, but simply an agreement that might ripen into an equity by complying with its terms. They were powerless to in any manner incumber the legal title; or even bind the parties to it in law so as to prevent the enforcement of legal rights when acquired, much less strangers to the transaction. Had they owned the land and held the legal title at the time, it might present a different question.

Appellee holding the legal title, he is, in ejectment, entitled to recover any portion of the quarter which may be in the possession of others.

It was again urged that appellee failed to obtain a legal assignment of the contracts upon which he obtained the conveyance from the company. If this be true we fail to understand how that question can be raised in an ejectment suit. He has obtained the legal title, and it must prevail until the conveyance is set aside, as all mere equities or irregularities in procuring the assignments are only cognizable in chancery.

Again, even if O'Byrne's heirs have any equitable title to this quarter, it is not such an outstanding title as can be interposed to defeat a recovery under appellee's legal title.

But, for the errors indicated, the judgment of the court below is reversed and the cause remanded.

*Judgment reversed.*