J. EDWARD KINSELLA, Appellant, *vs.* STEPHEN STEPHEN-
SON *et al.*—(ABE OLDS and L. P. SWANNELL, Appel-
lees.)

*Opinion filed October 16, 1914—Rehearing denied Dec. 9, 1914.*

1. CLOUD ON TITLE—*when grantee of a fractional quarter does
not take title to center of river.* Where land is conveyed as a gov-
ernment subdivision as a certain fractional quarter section and is
shown on the surveyor's plat as fractional because of temporary
overflow from the river, which, at its ordinary stage, is outside of
the quarter section lines of the fractional quarter, and these lines
can be ascertained from monuments and the lines of other subdi-
visions fixed by the surveyor, such grant will not extend beyond
the quarter section line.

2. SAME—*when title cannot be claimed by alluvion or accre-
tion.* A large body of land lying between the meander line of a
fractional section and a river, which land is overflow land, from
which the water recedes when the river is at its normal stage, can
not be treated as being a part of the fractional section by alluvion
or accretion.

3. SAME—*what is necessary to establish title by twenty years'
possession.* To establish title, by limitation, by twenty years' pos-
session, it is necessary to show that such possession was hostile or
adverse, that it was actual, visible, notorious and exclusive, and
that it was continuous and under claim of ownership; and these
matters must be made out by clear and positive proof.

4. SAME—*question of possession depends upon particular cir-
cumstances.* The question of possession depends to a great extent
upon the character of the land and the particular circumstances.

APPEAL from the Circuit Court of Kankakee county;
the Hon. CHARLES B. CAMPBELL, Judge, presiding.

On September 2, 1910, appellant, J. Edward Kinsella,
filed a bill in chancery in the circuit court of Kankakee
county against appellees, Abe Olds and L. P. Swannell, and
others, for the purpose of quieting title in him to certain
tracts of land situated in sections 14, 15, 16, 21, 22 and 23,
in township 31, in that county. The title to the lands de-
scribed in the bill of complaint, other than in section 23,

265 – 24

was quieted in appellant by the decree of the court and the determination of the title to that portion of section 23 lying north of the Kankakee river reserved for further decree. Olds and Swannell filed separate answers, in which they denied that appellant had any interest in certain tracts in section 23 claimed by them, and alleged title in themselves, respectively. Olds also filed a cross-bill, asking that a certain quit-claim deed from one Sheridan to appellant purporting to convey the land claimed by him, being that part of the north-east quarter of section 23 north of the Kankakee river, be canceled as a cloud on his title, and praying that the title to the land in question be quieted in him. Appellant answered, denying the allegations of the cross-bill. Replications were filed to the respective answers, and the cause was referred to the master in chancery to take the proofs and report his conclusions both as to the law and facts. The master in his report recommended that the title to that part of the north-west quarter of section 23 east of Poka-Nook-Con creek, and that part of the north-east fractional quarter of section 23 lying north of the Kankakee river, (which last described tract was claimed by Olds,) be quieted in appellant, and that the bill be dismissed as to that part of the north-west quarter of section 23 north of the Kankakee river and west of Poka-Nook-Con creek claimed by Swannell, and that the cross-bill of Olds be dismissed as to the lands claimed by him. Numerous objections were filed by the respective parties to the master's report, which were overruled by the master, which objections, on the coming in of the master's report, were ordered to stand as exceptions in the circuit court. On the hearing of the exceptions to the master's report the court did not rule upon each exception separately, but ordered that all exceptions be sustained in so far as they were not in conflict with the findings in the decree, and that they be overruled in so far as the findings in the decree are not in conflict with the master's report. The decree finds that appellant is not in

possession of the tracts claimed by Olds and Swannell, respectively; that Olds and Swannell are in possession of the respective tracts claimed by them; that Olds is the owner in fee simple, as claimed by him, of that part of the northeast quarter of section 23 lying north of the Kankakee river; that the deed from Sheridan to Kinsella should be canceled as a cloud upon Olds' title, and that as to these tracts appellant's bill be dismissed. From this decree appellant has prosecuted an appeal direct to this court.

Appellant's bill, with its amendments, alleges the jurisdictional facts that at the time of the filing of the bill he was the owner and in the actual, open, adverse and exclusive possession of the lands in question; that on January 28, 1910, he acquired title to the land in question in section 23 and to other lands in section 14 lying north of the Kankakee river, said section 14 being directly north of and adjoining section 23; that the subdivision of lands in sections 14 and 23, owing to the existence of the river, was fractional, and that the grants and conveyances of fractional sections carried the title of the grantee to the thread of the river south of the south line of section 14. The bill sets forth title by a chain of conveyances to the south half of section 14 from the United States to the State of Illinois, from it to the Illinois Central Railroad Company, from the latter company to one Stephenson, by *mesne* conveyances from the latter to one Whitehouse, from Whitehouse to Sheridan, and by quit-claim deed from Sheridan to appellant, of all of section 23 lying north of the present Kankakee river, and possession, under the deed, of the lands described in it, and the actual, open, notorious, adverse and exclusive possession of said lands for twenty years by appellant and his grantors, with possession and payment of taxes thereon since the year 1881, and a further claim by accretion and reliction to the riparian ownership of the fractional lands in section 14 bounded by the river, concluding with the allegation that appellees are making some claim

to the lands in question. The south half of section 14, included in the so-called Sheridan ranch, was conveyed by Sheridan to Kinsella, as were the other tracts in said ranch, by warranty deed, except that part of the north half of section 23 north of the Kankakee river, which was quit-claimed, only.

Olds, in his answer, denied the allegations of the bill, and in his cross-bill alleges that he is the owner in fee simple of all that part of the north-east quarter of section 23 lying north of the Kankakee river; that on or about January 4, 1839, one John Holbrook entered at the land office of the district of Chicago the following described lands of the United States subject to sale and entry, and that the United States by its patent conveyed to said Holbrook the aforesaid lands, being the north-east fractional quarter, the south-east fractional quarter and the north-west fractional quarter of the north-west fractional quarter, and the south-west fractional quarter of section 23, in the said township, containing 260.85 acres; that on November 23, 1839, Holbrook and wife conveyed by warranty deed to Joseph Hunt the lands above described; that on March 5, 1851, said Hunt and wife conveyed by warranty deed to George Olds the north-east fractional quarter, containing 61.16 acres, the south-east fractional quarter of the north-west fractional quarter, containing 32.73 acres, and the east half of the south-west quarter, containing 80 acres, in section 23; that on January 1, 1892, George Olds conveyed to Abe Olds by quit-claim deed the north half of said section 23 which lies north of the Kankakee river, which runs across said half section; that he is now the owner in actual possession, seized in fee simple of said real estate, and that he and his father, George Olds, through whom he obtained title, have since July 27, 1853, been in the actual, open, notorious, visible, peaceable, exclusive and uninterrupted possession and occupation of all that part of the north-east quarter of said section 23 lying north of the Kankakee river; that for

more than twenty years past and upwards, and during all of that time, they have paid all of the taxes levied and as-sessed upon the same as they became due and payable, and have secured absolute control of said real estate and en-closed the same with a fence, used the timber thereon when desired, and have been recognized by all the neighbors and owners of land adjacent as the owners of said real estate; that he is the owner and in the actual possession of said real estate under a title derived through a regular chain of conveyances from the government of the United States, and claims the benefits of his paper and record title under para-graph 7 of section 7 of the Limitation act of this State; that Millard J. Sheridan and wife had no title or color of title in or to said real estate in fee, possession, remainder, reversion or otherwise, and that the deed from said Sheri-dan and wife to J. Edward Kinsella of the said lands is a cloud upon his title; that the asserting of the same injures and depreciates the value of his real estate and renders the same less salable and marketable, and prays that the deed from Sheridan and wife to Kinsella of said lands be de-clared null and void and set aside as a cloud on his title. All of the material allegations of the cross-bill, except the entry by Holbrook and the conveyances as alleged, were denied by appellant in his answer thereto.

Swannell's answer to the bill of appellant, Kinsella, de-nies the jurisdictional fact of Kinsella's possession and the other material allegations of the bill, and sets up title to the north-west fractional quarter of the north-west frac-tional quarter of section 23 from the United States to Hol-brook, from him to Hunt and from Hunt to Robert Sher-man, and that on January 15, 1861, the sheriff conveyed said lands by tax deed to William G. Swannell; that on July 25, 1876, Swannell conveyed said land by warranty deed to Frederick Swannell as containing 47¼ acres; that on February 2, 1882, Frederick Swannell conveyed said land back to William G. Swannell; that Sheridan recog-

nized, acknowledged and admitted the title in William G.
Swannell and in his executors and heirs, and that for more
than thirty-five years prior to the Kinsella deed Sheridan
had acknowledged Swannell as owner of said land, had
negotiated with him for the purchase of the same, entered
into an agreement with his executor for the care and man-
agement of said land, and that Kinsella well knew at the
time he received the Sheridan deed that Sheridan did not
own it, etc.; that by Sheridan's contract with Kinsella he
was not entitled to any portion of said lands in section 23;
that Sheridan has never paid any taxes or made any claim
to possession or control except as agent of Swannell; that
the lands are swamp lands; that no portion could be culti-
vated or inhabited for residence; that in 1890 Sheridan
negotiated with William G. Swannell for leasing said lands
and agreed to look after and protect them, and afterwards
made a like arrangement with his executor; that the sheriff,
on November 13, 1868, by tax deed conveyed to Swannell
the north fractional quarter of the north-west fractional
quarter of said section 23, and that Swannell for more than
seven years prior to the commencement of said suit paid
all taxes on the same, and claims the benefit of the Statute
of Limitations relating to vacant and unoccupied lands;
that Sheridan is barred by *laches,* and that Kinsella had
both actual and constructive notice of his claim prior to
his purchase.

At the time of the government survey a map was made
of the township in which the lands are situated and re-
turned to the land office, together with the government field
notes made by the surveyors at that time. The map which
is in evidence shows that this land at the time of the sur-
vey was overflowed and marshy; that the surveyors were
unable to go upon the whole of the south part of section 14
or the north part of section 23, and that the Kankakee river
at the time spread out over the south part of section 14 and
the north part of section 23. They set up the corner stone

of the north-west quarter of section 23 ten chains north of the Kankakee river, and the map shows 7.41 acres of the north-west quarter of section 23 as being north of the river and west of Poka-Nook-Con creek, which empties into the Kankakee river east and south of the south-west corner of section 14. This stream is now about thirty feet in width and separates the 7.41 acres of the north-west quarter of section 23 from the balance of that section north of the Kankakee river. The map of this township as made and returned by the government surveyor at that time, in so far as it relates to these sections, is substantially as follows:

Shortly before this suit was commenced one Schmeltzer, a former county surveyor of Kankakee county, with the aid of the government map and field notes, made a plat of the lands embraced in these sections, showing the meander lines made by the government surveyor substantially coinciding with the river banks on each side as shown on the original government plat, from which it appears that there are

43 acres in the north-east quarter of section 23 north of the Kankakee river and 37.76 acres in the north-west quarter of that section north of the Kankakee river and east of Poka-Nook-Con creek. The plat is as follows:

Appellant claims title by *mesne* conveyances from the Illinois Central Railroad Company to one Anderson, from Anderson to one Johnson, from Johnson to Wilson and Peterson, from the latter to Sheridan, and from Sheridan to him, of the south half of section 14, and insists that since the south-west quarter and the south-east quarter of section 14 are shown by the government survey as fractional quarter sections and are bounded by the Kankakee river, each quarter section extends south to the thread of that stream, which is south of the north line of section 23, and that he is entitled to all that part of section 23 north of the river as a part of section 14 by accretion and the

recession of the water in the Kankakee river. The title of the Illinois Central Railroad Company to the land is based upon a grant by the United States government to the State of Illinois of certain lands for railroad purposes. Pursuant to this grant the State of Illinois incorporated the Illinois Central Railroad Company, and in 1852 granted to said railroad company certain sections of land, including the south-east fractional quarter of section 14, containing 103.45 acres, and the south-west fractional quarter of that section, containing 117.52 acres, which were duly conveyed to the railroad company in the manner provided by law, and which by *mesne* conveyances ultimately became the property of appellant.

The claims of the three parties to this suit are, in brief, as follows: Kinsella claims to be the owner of that portion of the north-east quarter of section 23 north of the Kankakee river, and also that portion of the north-west quarter of said section 23 north of the Kankakee river, (1) through a contract of purchase and deed from Sheridan and his actual possession of said land at the time of filing the bill under the Sheridan deed; (2) on his actual possession and Sheridan's possession under a deed from one Whitehouse to the north-west quarter; (3) on the ground that the grants of the south-east fractional quarter and the south-west fractional quarter of section 14, which lie immediately north of section 23, gave the grantee title to all land to the center of the river and Poka-Nook-Con creek; (4) on the ground of alluvion or accretion and reliction; (5) on adverse possession by Kinsella and his grantors for twenty years; (6) on the Whitehouse deed of 1882 and possession and payment of all taxes legally assessed. Olds' claim to the north-east quarter of section 23 is based on a continuous chain of *mesne* conveyances of record from the United States to himself, possession thereunder and payment of taxes. Swannell's claim of title to the north-west quarter is based on a tax deed and payment of taxes under

claim and color of title for more than seven years and on twenty years' adverse possession. Both Olds and Swannell set up the defense of *laches* and limitation to the bill of complaint of Kinsella. The evidence bearing on these matters will be discussed in the opinion.

McARDLE & McARDLE, and J. BERT MILLER, for appellant.

H. K. & H. H. WHEELER, and EDWARD P. HARNEY, for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Appellant urges that the court erred in dismissing his bill of complaint for want of equity as to the tracts claimed by appellees, Olds and Swannell, respectively, and in not also dismissing the cross-bill of Olds. It was proper, under the circumstances, to grant relief on the cross-bill of Olds. *Wachter* v. *Blowney,* 104 Ill. 610; *Houston* v. *Maddux,* 179 id. 377.

The only paper title claimed by Kinsella to any part of the land in controversy is his contract and deed from Sheridan, and a deed from Whitehouse to Sheridan, executed in 1882, conveying the north-west fractional quarter of section 23. There was no deed from anyone to Sheridan of the north-east quarter, and the title of complainant to that quarter must rest upon his adverse possession as alleged, or upon his claim that the original grantees of the south-east quarter and south-west quarter of section 14, the same being fractional quarters as shown by the government survey, took all the land to the thread or current of the Kankakee river, and that the land became his by alluvion and accretion.

A grant of land bordering on a stream, whether navigable or not, carries title to the center thread of the stream unless the boundary is in some other way designated. (*City*

*of Peoria* v. *Central Nat. Bank,* 224 Ill. 43.)    A meander line which is run for the purpose of ascertaining the amount of land in a fractional section cannot be regarded as a boundary line.    (*Houck* v. *Yates,* 82 Ill. 179; *Middleton* v. *Pritchard,* 3 Scam. 510; *Canal Trustees* v. *Haven,* 5 Gilm. 548.)    These cases, however, were decided on the ground that the river itself was taken as the actual boundary of the land.    In *Houck* v. *Yates, supra,* the riparian owner had title to the west fractional half of the northeast quarter and the fractional north-west quarter of section 5, the lines of which running south extended to the center of the then channel of the Mississippi river and included the land in controversy.    The court, on page 182, said: "Had any corner or monument been established to mark the southern boundary of appellee's purchase, by the government surveyors, such would have been conclusive. That, however, did not occur, but the river seems to have been left to mark the southern boundaries of the land."

In *Granger* v. *Swart,* 1 Wol. 90, it was held that if between the meander line by which the government survey was made, and the bank of the river, there is at the time a body of swamp or waste land or flats in which timber and grass grew and horses and cattle fed, then the patents for the land surveyed would not cover this land but be confined to the limits of the meander line and include no more.

In *Lammers* v. *Nisson,* 4 Neb. 245, it was held that the mere fact that a meander line was run and was designated upon the plat was not conclusive and would not estop the government from disposing of lands left unsurveyed between such line and the bank of the stream; that to do otherwise would prevent the correction of mistakes made by surveyors in such case.

In *Bissell* v. *Fletcher,* 19 Neb. 726, the court held that where the plat and patent to the plaintiff was to lot 3, containing 52.60 acres, and to run north to the Republican river, he was not entitled to claim lots 6 and 7, containing

about 117 acres, and which, in fact, was land between the river and where the plat showed the bank to be.

Section 10,144 of the Revised Statutes of the United States (Pierce's Code) provides: "The boundary actually run and marked in surveys returned by the surveyor general shall be established as the proper boundary lines of the section or subdivision for which they were intended, and the length of such lines as returned shall be held and considered as the true length thereof, and the boundary line which has not been actually run and marked shall be ascertained by running straight lines from established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary line shall be ascertained by running from the established corners to north and south or east and west lines, as the case may be, to the water-course, Indian boundary line or to the external boundary of such fractional township."

In *Clute* v. *Fisher,* 65 Mich. 48, it is said: "The land described as a fraction of any subdivision, as, for instance, the south-east fractional quarter, cannot be extended beyond the lines of said subdivision as they would run if extended."

A grantee, by patent, of a legal subdivision of land can not thereby derive title to land upon another legal subdivision. (*Farmers* v. *Dodge,* 64 Mich. 175; *Wilson* v. *Hoffman,* 54 id. 246; *Keyser* v. *Sutherland,* 59 id. 455.) The purchase of a fraction of a quarter section could not give to the purchaser a larger body of land than a grant of the whole would give. *Edwards* v. *Ogle,* 76 Ind. 307.

In the case of *Sawyer* v. *Cox,* 63 Ill. 130, this court said: "The object of these surveys is, first, if practicable, to find the original corners established by the surveys made by the authority of the government. It is by those lines and corners the government sold and persons purchased the public land, and when sold, the purchaser, by his patent, ac-

quired title to all of the land embraced within the boundary lines of the tract thus purchased. When the lines and corners established can be found and identified the purchaser acquires title to all the lands embraced within their limits, and it does not matter whether the surveys are accurate, as the boundaries, when found, must control the notes or plat of the survey, hence they govern the calls for course, distance and quantity. The plats and notes of the survey are intended to represent what was done in the field and must yield to the lines and corners when found, but when they have become obliterated and cannot be found and traced by natural or artificial monuments, they can only be re-located by the field notes and plats of the original survey, and in doing so then resort must be had to known lines and monuments as a basis on which to survey and find where the original lines and corners were established by the government surveyors." And in *Fuller* v. *Shedd*, 161 Ill. 462, this court held that the section lines could not be passed when a lake was so large that the extension of those lines would not absorb it.

In *James* v. *Howell*, 41 Ohio St. 696, the court refused to extend the meander line across a space designated as an impassable marsh and water so as to include two islands, the computed acres in the grant not including either the marsh, water or island.

In *Shoemaker* v. *Hatch*, 13 Nev. 261, the court said: "To determine whether a bar or island is part of the land on either side of a stream, account must be taken, in every case, of a variety of circumstances, such as the relative size and permanence of the channels, the size of the island compared with the size of the stream, and the conformity or divergence of course between the main line and the main channel. It is a question of fact to be determined from all the surrounding circumstances whether the land between a meander line and the shore of the lake or water-course is included in the survey."

In *Martin* v. *Carlin,* 19 Wis. 454, there was .a mistake in the original survey and meandering of Rock river, so that there was more land than the survey called for by the field notes. It was held that where there is a mistake in the survey of a fractional lot, so that either the line of a meandered stream or a quarter section line (both of which were called for by the survey as constituting the line) must be abandoned, the quarter section line should be adhered to as the more certain call.

In the case of *Fuller* v. *Shedd, supra,* after citing the foregoing cases, this court, in its opinion by Mr. Justice Phillips, said: "From these cases it would follow the construction of the grant would be: where a narrow strip of land lies between the meander line and the natural boundary, as a stream or river, and its proportions are much smaller than the land granted, it would be included in the grant and the center of the stream or river would be the boundary unless a different intention was manifested by the terms used. Where the land outside the meander line is so grossly in excess of that sold that it is apparent there is fraud or mistake in the survey, the meander line would be the boundary."

In the case at bar, while there is no evidence of either fraud or mistake in the survey of 1834, by which the meander lines were established, the river at its usual stage of water did not form the boundary of the south-west quarter and south-east quarter of section 14, and the meander lines were run as they were because of high water at the time, the Kankakee river having overflowed its banks so that it was impossible to establish the south-east corner of section 14, which would be the north-east corner of section 23. We gather from the evidence in the record that the main channel and banks of the river at the ordinary or low stage of water were in about the same place at the time of the survey of 1834 as they were when the suit was tried, and that between the meander lines as run by the sur-

veyor and the bank of the river were large portions of the south-east quarter of the south-west quarter of section 14, and also the premises in dispute in the north part of the north-east quarter and north-west quarter of section 23. This was heavily timbered in part, with large trees growing thereon, and some pasture when the river subsided within its banks. As we have stated, the south-west corner of section 14 was established and marked and a basis made for running the section line between sections 14 and 23 and so determining the proper boundary lines between those sections. We are therefore of the opinion that the grantee from the government of the south-west quarter and the south-east quarter of section 14, and the subsequent grantees down to Kinsella, took by their deeds the quantity of land as originally surveyed by the government and denoted as fractional, and also took all of the land contained within the boundary of said quarter sections when the same should be established, but they would not thereby take title to any land outside of the said quarters, and would not take any title thereby to any lands in section 23.

Nor do we think that appellant is in a position to claim any title to the lands in question by alluvion and accretion, as being a part of section 14 by reason of the subsidence of the Kankakee river, for the reason that he has estopped himself, both by the allegations of his bill and the deed under which he claims title, from insisting such lands are not a part of section 23. In the deed the land is described as being in section 23, and in the bill filed by him in this cause he has specifically alleged that the lands in question are in section 23, and more particularly in that part of section 23 which is north of the Kankakee river. He is now estopped by these acts from insisting that the land is not in section 23. (*Millard* v. *Millard,* 221 Ill. 86; *Smith* v. *Young,* 160 id. 163.) Furthermore, the land between the meander lines and the river was simply the overflow land

from which the high water subsided when the river was at the normal or low stage.

As to the title claimed by appellant by twenty years' possession, to establish such title by limitation by twenty years' possession it was necessary to show, first, that such possession was hostile or adverse; second, actual; third, visible, notorious and exclusive; fourth, continuous; fifth, under claim of ownership; and such elements must be made out by clear and positive proof. (*Clark* v. *Jackson,* 222 Ill. 13; *McClellan* v. *Kellogg,* 17 id. 498; *Towle* v. *Quante,* 246 id. 568.) The question of possession depends to a great extent upon the character of the lând and the circumstances. As we have shown, the tracts of land in dispute were overflow lands, covered with water and inaccessible for ordinary use during much of the time, and owing to the character of the land and its uninhabitable condition no very pronounced acts of ownership or possession were possible. The lands comprising the so-called Sheridan ranch appear to have been fenced, and the fences extended along the east and west sides of section 14 south to the Kankakee river, thus enclosing on the east and west sides the lands in dispute. It also appears that the cattle pastured by different tenants on the Sheridan ranch ranged over this land at times, and, as some witnesses testified, when the water was low they would cross the river to the south, and cattle owned by others, pasturing on the south of the river, would cross over to the north onto the lands in dispute. It also appears that certain persons, under permission from Sheridan, the former owner, at different times cut wood upon portions of the land in dispute, but this evidence is not very definite. For many years there was no boundary line established between sections 14 and 23, and it is not shown very clearly whether the wood that was cut and hauled off in the winter time under permission from Sheridan was on section 23 or section 14. George Olds, father of appellee Abe Olds, had the record title to the north-east quarter.

From the time he first obtained title to this land, in 1851, he was in possession of the same, as far as such possession was possible. He cut and sold wood, hewed timber from the land, warned trespassers off the land, and exercised acts of ownership both before and after Sheridan bought the adjoining land, in 1882. After he conveyed the land to his son, Abe Olds, in 1892, the latter had a saw mill there one winter and took wood from it. Soon after he got his deed he had the north line of said north-east quarter of section 23 between that section and the south-east quarter of section 14 surveyed and established, built a wire fence along such line, and afterwards turned his hogs in on said land, warned trespassers off of the said land, and exercised such other acts of ownership over it as were possible in its then condition. Sheridan testified that he cut the fence when he heard that it had been placed there, and there is evidence that wires were cut by hunters and fishermen at times of high water so they could get their boats through. Olds states the fence was cut and washed out at times and he kept it in repair as best he could. He testified that on one occasion he had a conversation with Sheridan, which is not denied, about some poles that had been cut on the river bottom, and Sheridan stated that if they had been cut on Olds' land he would pay for them, and if Olds had cut any on his land he should have to pay for them. He also testified that shortly after he had fenced this land Sheridan tried to buy it from him and made an offer, and he offered to take a larger amount, but they could not agree on the price.

Without discussing all the evidence bearing upon the question of possession, we have given the same such consideration as we think it is entitled to, and on the whole are satisfied that the circuit court did not err in its finding as to the possession and ownership of the land. Such possession as Sheridan had or claimed to have, under the circumstances was not, as shown by the evidence, hostile, exclusive or under claim of ownership.

265 — 25

As to the title to that portion of the north-west quarter of section 23 north of the Kankakee river claimed, respectively, by Kinsella and Swannell, Sheridan, the grantor of Kinsella, did obtain a deed from Whitehouse to said land. No title, however, is shown in Whitehouse and no reason or authority for such conveyance is given. He was a stranger to the title and such deed is not explained. William G. Swannell secured a deed for 7.41 acres of the same in 1861, the land being sold for taxes for the year 1858. Thereafter Swannell paid taxes on the land for several years as containing 47.25 acres. In 1876 the lands were again sold for delinquent taxes levied upon the tract as the north fractional north-west quarter of section 23, Swannell becoming the purchaser at such tax sale. On February 2, 1882, Swannell and wife conveyed the land to Frederick Swannell as containing 47.25 acres, and thereafter, from 1882 to 1890, inclusive, and ever since that time, the taxes have been paid by the Swannells on 47.25 acres. It further appears that on February 16, 1890, M. J. Sheridan, the then owner of section 14, had some correspondence with William G. Swannell relating to the renting of Swannell's land in section 23, and in replying to a letter of Swannell Sheridan says: "Yours referring to the leasing of your land in section 23 received some time ago. Replying will say that your land is all swamp timber and could not be of any use to me. Before I bought my land the timber was all cut off yours, but since I have kept people off of it, as they would cut over on mine if I allowed them to cut near there. There is now a very nice growth of young timber coming, which will be worth something in a few years if protected. The last year was the first in which anyone could get onto your timber during the summer since I bought my land, in '80 or '82." There is also evidence to the effect that on several occasions there were negotiations between Sheridan and Swannell, and after Swannell's death with his executor, relating to the purchase of this land, and from a

survey of all of the facts and circumstances we do not feel disposed to hold the court's conclusion that the weight of the evidence shows that Sheridan had recognized both Olds and Swannell as being the owners of the property which is now in dispute was erroneous.

In Sheridan's contract with Kinsella, made in 1909, it was shown that he agreed to sell and convey 1200 acres of land, more or less, in sections 14, 15, 16, 21 and 22, and quit-claim any land in section 23 now standing in his name of record, guaranteeing a merchantable title to at least 1200 acres. It appears that subsequently, under this agreement, a survey was made of the Sheridan lands, and, outside of any land in section 23 claimed by either Olds or Swannell, Kinsella acquired the title to 1260 acres. After the commencement of the suit Sheridan stated to the executor of the Swannell estate that he did not want Swannell to think that he was deeding property upon which he had no claim or title or was trying to steal it; that he had made a contract with Kinsella to convey him certain land but had not intended to sell section 23; that he told Kinsella he had no claim whatever to the Swannell land; that it belonged to the W. G. Swannell estate, and that he still knew that to be the case. The fact that his cattle and his tenant's cattle were allowed to roam over the land whenever it was dry enough, or that he allowed wood to be cut and sold therefrom near the dividing line, would not support a claim of ownership or possession, as it appears he had never leased or attempted to exercise any acts of ownership or possession over lands outside of section 14. Under the circumstances we think the court properly decreed that appellant had no interest in the Swannell tract.

We find no error in the decree sufficient to warrant a reversal, and the decree of the circuit court will be affirmed.

*Decree affirmed.*